**NEW HAMPSHIRE RIGHT TO LIFE POLITICAL ACTION COMMITTEE,**
**Plaintiff, Appellant,**

v.

**William M. GARDNER, in his official capacity as the Secretary of State of the State of New Hampshire, et al., Defendants, Appellees.**

No. 96–1744.

United States Court of Appeals,
First Circuit.

Heard Sept. 5, 1996.

Decided Nov. 1, 1996.

James Bopp, Jr. with whom Paul R. Scholle, Bopp, Coleson & Bostrom, Terre Haute, IN, and Stephen F. Queeney, Amherst, NH, were on brief, for appellant.

Lucy C. Hodder, Assistant Attorney General, with whom Martin P. Honigberg, Senior Assistant Attorney General, Concord, NH, was on brief, for appellees.

Before SELYA, Circuit Judge, ALDRICH and BOWNES, Senior Circuit Judges.

SELYA, Circuit Judge.

Like forecasted hurricanes, approaching elections invariably give rise not only to gusts of wind but also to feverish preparations. And, just as the prudent fisherman does not trust in chance to save his boat from the gathering storm, the sage political activist does not rely on an unenlightened electorate to save her candidate from the vicissitudes of the ballot box. Still, government from time to time attempts to circumscribe the ways and means of bringing enlightenment to a sometimes truculent public. This appeal comes to us by virtue of one such restriction: the $1,000 per election limit that New Hampshire places on "independent expenditures" in a political campaign.[1] *See* N.H.Rev.Stat. Ann. (RSA), tit. LXIII, ch. 664:5, V; 664:3, I; 664:3, II (Supp.1995).

In this case the appellant New Hampshire Right to Life Political Action Committee (N–PAC) challenges the constitutionality of the New Hampshire limitation, arguing that the statutory scheme violates the First Amendment.[2] In the course of denying a requested preliminary injunction, the district court dismissed the case sua sponte. The court held that the appellant lacked standing to maintain the action. Because N–PAC faces a credible threat of prosecution if it pursues its wonted activities, we conclude that it does have standing to mount a pre-enforcement facial challenge to the statutory cap. Consequently, we reverse the district court's order of dismissal, and, because the merits of the case are clear, we strike down New Hampshire's ceiling on independent expenditures.

## I. THE STATUTORY SCHEME

Understandably perturbed by the corrosive effect of money on the electoral process, New Hampshire began to enact campaign finance reform legislation as far back as 1989. In 1991 the state legislature capped a political committee's ability to make "independent expenditures" at $1,000 per election.[3] The relevant statute reads:

1. New Hampshire considers independent expenditures to include expenditures by a political committee for the purpose of "expressly advocating the election or defeat of a clearly identified candidate which are made without cooperation or consultation with any candidate, or any authorized committee or agent of [any] candidate, and which are not made in concert with, or at the request or suggestion of, any candidate, or any authorized committee or agent of ·[any] candidate." N.H.Rev.Stat. Ann., tit. LXIII, ch. 664:2, XI. That definition is not atypical. *See, e.g.,* Ariz.Rev.Stat.·Ann., tit. 16, ch. 6, § 16–901(11); Or.Rev.Stat., tit. 23, ch. 260.005(8).

2. The First Amendment applies to states by operation of the Fourteenth Amendment. *See 44 Liquormart, Inc. v. Rhode Island,* —— U.S. ——, —— n. 1, 116 S.Ct. 1495, 1501 n. 1, 134 L.Ed.2d 711 (1996).

3. In the vocabulary of the statute, a political committee includes "any organization of 2 or more persons [that attempts] to influence elections...." RSA 664:2, III.

No political committee shall make independent expenditures in excess of $1,000 for any or against any candidate running for a particular office in a state primary election, and a like amount in a state general election, in support of or to oppose any candidate.

RSA 664:5, V. Two other statutes complement the general restriction on independent expenditures. First, the state requires a political committee to file a declaration with the Secretary of State pledging that it "will not exceed the expenditure limitations allowed under RSA 664:5, V." RSA 664:3, I. Another statute provides that "[o]nly those political committees that have filed a declaration with respect to independent expenditures ... may make such expenditures." RSA 664:3, II. The violation of any of these provisions is a criminal offense. *See* RSA 664:21, V.

New Hampshire vests enforcement of this statutory scheme in its Attorney General. *See* RSA 664:18. The Secretary of State is charged with receiving and examining reports of election expenditures and notifying the Attorney General of any suspected improprieties. *See* RSA 664:19.

## II. THE GATHERING STORM

N-PAC is a political committee within the contemplation of RSA 664:2, III and has been registered as such with the Secretary of State for over a decade. The organization's stated purpose is to "promote the sanctity of human life from conception to natural death." N-PAC works in a variety of ways to accomplish this goal. Among other stratagems, it supports (or opposes) various candidates for state office whom it perceives as endorsing (or denigrating) its views. N-PAC's support manifests itself through the expenditure of funds for such purposes as purchasing advertisements and distributing leaflets.

Over the past decade N-PAC typically has spent all the contributions that it receives on some form of right-to-life political advocacy. The 1996 election followed this well-trodden path. Originally, N-PAC vowed to make political expenditures opposing a certain candidate in the primary election, but that candidate withdrew. N-PAC then shifted gears and decided to throw its support behind a different candidate who was running for state office in the primary election.[4]

Ellen Dube, a state employee, functions as the Secretary of State's liaison with the Attorney General. One of Dube's duties is to report possible violations of RSA 664 to the Attorney General, who then makes the decision whether to investigate and/or prosecute. On March 6, 1996, N-PAC's president, Barbara Hagan, telephoned Dube. Hagan inquired if the state intended to enforce the statutory limitation on independent expenditures. Dube replied that infractions "would be noticed" and that the state would commence enforcement actions against any persons who violated RSA 664:5, V. Hagan subsequently posed the same question to Wynn Arnold, a member of the Attorney General's staff. Arnold advised her that the initiation of an enforcement action would depend on whether there had been a referral from the Secretary of State. He refused to deny that the Attorney General would enforce RSA 664:5, V.

N-PAC then filed suit in New Hampshire's federal district court against the Secretary of State, William M. Gardner, and the Attorney General, Jeffrey R. Howard. N-PAC's verified complaint alleged that it intended to exceed the limitation on independent expenditures in the 1996 election campaign, that it feared prosecution if it did so, and that the challenged statutory provisions impermissibly burdened its free-speech rights and thereby ran afoul of the Supreme Court's holding in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). N-PAC sought a declaratory judgment that RSA 664:5, V and 664:3, I & II on their face chill its political expression and thereby abridge its constitutional rights. It also sought an order restraining the defendants from enforcing these statutes against it.

Within a week, N-PAC filed a motion for a preliminary injunction. In describing the

---

**4.** The identity of the candidate, his or her party affiliation, and the particular office sought are being held in confidence pursuant to an agreement between the parties.

need for this relief, N–PAC focused on three sets of expenditures which it intended to make for the September 10 primary election: (1) its contemplated purchase of an advertisement endorsing the candidate in the June edition of the New Hampshire Right to Life Committee (NHRLC) newsletter (estimated cost: $900); (2) its planned distribution at public events around the state on July 4 of roughly 30,000 fliers supporting the candidate (estimated cost: slightly over $3,000); and (3) its proposed purchase of a follow-up advertisement in either the August or September issue of the NHRLC newsletter (estimated cost not disclosed in the record).

After deposing Hagan and learning of these projected expenditures, the defendants informed N–PAC that the state would not take any enforcement action because of its belief that the pattern of contacts between N–PAC and the candidate whom it had opted to support precluded classification of the proposed expenditures as "independent" within the purview of RSA 664:2, XI. As what seemed to them a logical corollary of this determination, the defendants asserted that in the absence of a threat of enforcement, N–PAC could not claim to have suffered any cognizable injury by operation of the challenged statutes and therefore had no standing to contest their constitutionality.

On June 21, 1996, the district court denied the motion for a preliminary injunction. In that same order the court—relying heavily on the Attorney General's representation that the specified expenditures, if made, would not engender prosecution—sua sponte dismissed the action for want of standing.[5] In the court's view its conclusion that N–PAC lacked standing "present[ed] a constitutional barrier not only to the adjudication of the instant motion but also to the court's consideration of the merits of the case." As part and parcel of this determination, the court concluded that N–PAC did not face a credible threat of prosecution based on the aggregate effect of the $900 expenditure it had already made and the other two planned

expenditures. Importantly, the court neither dwelt on N–PAC's prayer for declaratory relief nor assayed the threat of prosecution vis-à-vis other potential expenditures.

N–PAC filed this appeal, but it refrained from printing the fliers or purchasing a second advertisement.

## III.  STANDARD OF REVIEW

We review standing determinations de novo, crediting the plaintiff's factual allegations to the extent that they are material and construing those alleged facts, together with the reasonable inferences therefrom, in favor of the plaintiff. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *Benjamin v. Aroostook Medical Ctr., Inc.,* 57 F.3d 101, 104 (1st Cir.1995); *United States v. AVX Corp.,* 962 F.2d 108, 114 (1st Cir.1992). Where, as here, dismissal is ordered sua sponte, the ultimate standard of review does not vary, but the court of appeals must take an extra step, scrutinizing the proceedings carefully to make certain that the plaintiff has had a fair opportunity to put its best foot forward. *See, e.g., Carparts Distribution Ctr., Inc. v. Automotive Wholesaler's Ass'n of New Eng., Inc.,* 37 F.3d 12, 15 (1st Cir.1994); *Preterm, Inc. v. Dukakis,* 591 F.2d 121, 134 (1st Cir.), *cert. denied,* 441 U.S. 952, 99 S.Ct. 2181, 2182, 60 L.Ed.2d 1057 (1979).

## IV.  STANDING

Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth,* 422 U.S. at 498, 95 S.Ct. at 2204–05. After all, "[i]f a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case." *AVX,* 962 F.2d at 113.

Curiously, the doctrine of standing, though vitally important for federal courts, remains a morass of imprecision. The Justices once termed it "a concept of uncertain meaning

---

5. The court considered and rejected N–PAC's contention that the Attorney General lacked the authority to make these representations, finding "the representations to be binding and the plaintiff to be protected by them." Given the basis for our decision, *see* text *infra,* we do not review this finding, and we express no opinion on the correctness of the legal proposition upon which it rests.

and scope," *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 1949–50, 20 L.Ed.2d 947 (1968), and a quarter-century later we acknowledged that, even after so many years, the "ingredients of standing are . . . not easily susceptible to concrete definitions or mechanical application." *AVX,* 962 F.2d at 113. In the absence of any hard-and-fast test, we limn those guidelines on which federal courts seemingly agree and then move to a more particularized discussion of the cases that provide the best analogies for the present situation. After dealing briefly with prudential concerns, we apply these distilled principles to the standing issue in this case. Finally, we address the possibility that the case is moot.

### A

■ Standing involves "a blend of constitutional requirements and prudential considerations." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). The constitutional requisites stem from the admonition that a federal court is empowered only to decide "cases" and "controversies." *See* U.S. Const., Art. III. Not every dispute is a case or controversy. "The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." *Diamond v. Charles,* 476 U.S. 54, 62, 106 S.Ct. 1697, 1703, 90 L.Ed.2d 48 (1986). To clear the Article III hurdle, the party who invokes a federal court's authority must show that (1) he or she personally has suffered some actual or threatened injury as a result of the challenged conduct; (2) the injury can fairly be traced to that conduct; and (3) the injury likely will be redressed by a favorable decision from the court. *See Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758; *Vote Choice, Inc. v. DiStefano,* 4 F.3d 26, 36 (1st Cir.1993). The complaining party must satisfy this test throughout the litigation, not just at the moment when the complaint is filed. *See Steffel v. Thompson,* 415 U.S. 452, 459 n. 10, 94 S.Ct. 1209, 1215–16 n. 10, 39 L.Ed.2d 505 (1974).

■ The second and third prongs of the test are not legitimately in issue here. To the extent that N–PAC has suffered a cognizable injury at all—a matter to which we shall soon return—the injury can be traced to the existence and threatened enforcement of the challenged statutes. That injury is also redressable in this action: when a plaintiff seeks a declaration that a particular statute is unconstitutional, the proper defendants are the government officials charged with administering and enforcing it. *See Diamond,* 476 U.S. at 57 n. 2, 106 S.Ct. at 1700–01 n. 2; *Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3104–05, 87 L.Ed.2d 114 (1985). Consequently, the dispositive inquiry here involves the test's first prong: the existence *vel non* of an actual or threatened injury.

■ This inquiry is always case-specific, and that truism applies with special force in this instance. When, as now, a party launches a pre-enforcement challenge to a statute that provides for criminal penalties and claims that the statute, on its face, abridges First Amendment rights, two potential injuries must be considered. First, there is the injury which attends the threat of enforcement. As the Court has repeatedly explained, it is not necessary that a person expose herself to arrest or prosecution under a statute in order to challenge that statute in a federal court. *See Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979); *Steffel,* 415 U.S. at 459, 94 S.Ct. at 1215; *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). The rationale that underlies this rule is straightforward: a credible threat of present or future prosecution itself works an injury that is sufficient to confer standing, even if there is no history of past enforcement. *See Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973).

■ The second type of injury is peculiar to the First Amendment context. In such cases, an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences. *See Meese v. Keene,* 481 U.S. 465, 473, 107 S.Ct. 1862, 1867, 95 L.Ed.2d 415 (1987); *Wil-*

*son v. Stocker,* 819 F.2d 943, 946 (10th Cir. 1987). In such situations the vice of the statute is its pull toward self-censorship. *See Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383, 393, 108 S.Ct. 636, 643, 98 L.Ed.2d 782 (1988).

■ Of course, these two types of injury are interrelated. Both hinge on the existence of a credible threat that the challenged law will be enforced. If such a threat exists, then it poses a classic dilemma for an affected party: either to engage in the expressive activity, thus courting prosecution, or to succumb to the threat, thus forgoing free expression. Either injury is justiciable. Conversely, if no credible threat of prosecution looms, the chill is insufficient to sustain the burden that Article III imposes. A party's subjective fear that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable. *See Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–26, 33 L.Ed.2d 154 (1972); *Chamber of Commerce v. FEC,* 69 F.3d 600, 603–04 (D.C.Cir.1995); *see also ACLU v. Florida Bar,* 999 F.2d 1486, 1492 (11th Cir.1993) (noting that when the claimed injury is one of self-censorship, the likelihood of enforcement action becomes an important factor in determining whether there is more than merely a subjective chill). The bottom line is that, as long as a credible threat of prosecution exists, a litigant has standing to mount a pre-enforcement challenge to the facial constitutionality of a statute on the basis that her First Amendment rights arguably are being trammelled.

■ Because the threat of prosecution is a common denominator of both types of injury, their existence can be resolved in a single inquiry. The contours of that inquiry are well-defined. In a pre-enforcement challenge to a statute carrying criminal penalties, standing exists when "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute, and there exists a credible threat of prosecution." *Babbitt,* 442 U.S. at 298, 99 S.Ct. at 2308. The first two-thirds of the *Babbitt* framework fit this case snugly. The

record reveals that N–PAC intends to engage in political expenditures of a type protected under the First Amendment, *see Buckley,* 424 U.S. at 14, 96 S.Ct. at 632, and New Hampshire's statutory scheme restricts N–PAC's freedom to make those expenditures. Thus, the bone of contention here is whether the third prong of the *Babbitt* framework fits. In the next section, we gnaw upon that bone.

**B**

While bright lines grow faint in the area of standing, we believe that a discussion of pertinent caselaw illuminates the path to appropriate resolution of this appeal. We begin with bedrock: "The conflict between state officials empowered to enforce a law and private parties subject to prosecution under that law is a classic 'case' or 'controversy' within the meaning of Art. III." *Diamond,* 476 U.S. at 64, 106 S.Ct. at 1704. To establish the conflict needed to animate this principle, however, a party must show that her fear of prosecution is "not imaginary or wholly speculative." *Babbitt,* 442 U.S. at 302, 99 S.Ct. at 2310–11.

This standard—encapsulated in the phrase "credible threat of prosecution"—is quite forgiving. *Babbitt* illustrates how readily one can meet it. There, the plaintiffs attacked a statute that criminalized certain deceptive statements made during consumer publicity campaigns and sought a declaration of the statute's unconstitutionality. *Id.* at 301, 99 S.Ct. at 2310. Although the defendants noted that no criminal penalties had ever been levied under the statute and argued that none might ever be imposed, the Court found a credible threat of prosecution. It observed that the plaintiffs had engaged in consumer publicity campaigns in the past and that they professed an intent to engage in such activities in the future. *Id.* Since "the State has not disavowed any intention of invoking the criminal penalty provision against [violators]," the plaintiffs were "not without some reason in fearing prosecution for violation of the ban on specified forms of consumer publicity." *Id.* at 302, 99 S.Ct. at 2310–11.

Other cases set a similarly low threshold. In *Doe*, the Justices held that a class consisting of doctors who performed abortions had standing to challenge the constitutionality of Georgia's statutes restricting the procedure, notwithstanding that no physician "ha[d] been prosecuted, or threatened with prosecution, for violation of the ... statutes." 410 U.S. at 188, 93 S.Ct. at 745. The *Doe* Court distinguished *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), in which standing had been denied, on the ground that *Poe* involved a hoary statute that had led to only one prosecution in more than eighty years. "Georgia's statute, in contrast, is recent and not moribund." *Doe*, 410 U.S. at 188, 93 S.Ct. at 745.

*American Booksellers* is of like tenor. That case involved a pre-enforcement facial challenge to a Virginia obscenity statute. The Court rejected the state's plea that the plaintiffs had sued prematurely (the statute having been only recently enacted and not yet having taken effect). The Justices reasoned that the law was "aimed directly" at entities like the plaintiffs, who would either have to "take significant and costly compliance measures or risk criminal prosecution." *American Booksellers*, 484 U.S. at 392, 108 S.Ct. at 642. Since "[t]he State ha[d] not suggested that the newly enacted law will not be enforced," the booksellers had "an actual and well-founded fear that the law [would] be enforced against them." *Id.* at 393, 108 S.Ct. at 643. They thus had standing to mount a pre-enforcement facial challenge to it. *See id.* In reaching this conclusion, the Court took pains to note that the "danger of this statute is, in large measure, one of self-censorship" and termed self-censorship "a harm that can be realized even without an actual prosecution." *Id.*

Federal appellate courts echo these holdings. In *Chamber of Commerce* the D.C. Circuit found standing to mount a facial challenge to a Federal Election Commission regulation despite the fact that the FEC was split on the advisability of the rule and there was no present danger of enforcement. The court explained that a credible threat of prosecution nonetheless existed because nothing "prevents the Commission from en-

forcing its rule at any time with, perhaps, another change of mind of one of the Commissioners." 69 F.3d at 603. Similarly, in *Wilson*, which bears a family resemblance to the case at bar, the Tenth Circuit held that when a state statute chills the exercise of First Amendment rights, standing exists even though the official charged with enforcement responsibilities has not taken any enforcement action against the plaintiff and does not presently intend to take any such action. 819 F.2d at 946–47.

■ The preceding cases make clear that when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence.

## C

■ Of course, in addition to its constitutional dimensions, "the doctrine of standing also embraces prudential concerns regarding the proper exercise of federal jurisdiction." *AVX*, 962 F.2d at 114. To satisfy these concerns, a suit must meet certain additional criteria. We mention three of them. First, the complaint must "fall within the zone of interests protected by the law invoked." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Next, under the principle of *jus tertii*, the plaintiff ordinarily "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499, 95 S.Ct. at 2205. Third, the suit must present more than "abstract questions of wide public significance which amount to generalized grievances, pervasively shared and most appropriately addressed in the representative branches." *Valley Forge*, 454 U.S. at 475, 102 S.Ct. at 760 (citations and internal quotation marks omitted).

■ In the circumstances of this case, N–PAC readily satisfies the prudential prerequisites for a grant of standing. First, its complaint implicates basic political expression and advocacy; it thus falls comfortably

within the zone of interests protected by the First Amendment. Second, N–PAC is asserting its own legal rights, as the statute takes direct aim at a class of entities (political committees) to which it belongs. Third, N–PAC's disagreement with New Hampshire's cap on independent political expenditures is a sufficiently particularized grievance.

## D

In this case, therefore, standing depends upon whether N–PAC faces a credible threat of prosecution. To answer this question, we must first place the matter into better perspective.

In its complaint N–PAC sought both declaratory and injunctive relief. Because it projected that it would make certain expenditures in June, it focused its initial efforts on securing a preliminary injunction that would permit it to make those outlays in the proper time frame. The defendants also concentrated on these expenditures, eventually representing to the district court that the Attorney General did not consider them to be "independent" under RSA 664:2, XI, and therefore the expenditures, even if made, would not trigger RSA 664:5, V. In its ruling on the motion for preliminary injunctive relief, the lower court correctly focused on this point.

But then the court went beyond the scope of the pending motion, deemed the treatment of the initial expenditures to be dispositive of the entire case, and dismissed the complaint out of hand. In doing so, the court erred. The purpose of a preliminary injunction is simply to "preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). Because a preliminary injunction is customarily granted or denied on the basis of procedures and considerations that differ markedly from those that apply at trial, it is risky business for a district court to enter final judgment at the preliminary injunction stage. *See id.* This case bears witness to that admonition.

In grafting a sua sponte dismissal onto the denial of a motion for a preliminary injunction, the district court effectively denied N–PAC any opportunity to develop its evidence and arguments for declaratory relief. More importantly, the court confused the threat of enforcement which existed *relative to the initial expenditures* with the broader threat of enforcement that had to be considered in ruling on N–PAC's standing to seek a declaration that the statutory scheme is unconstitutional on its face. In this case, the distinction is crucial.

The district court may or may not have been correct in determining that the representations made by the defendants removed any danger of prosecution for the specific expenditures that N–PAC sought to make in the summer of 1996. *See supra* note 5. But N–PAC's standing for purposes of the suit— as opposed to the preliminary injunction— cannot be determined solely with reference to those expenditures. Given the fact that the district court dismissed the action sua sponte, we must scrutinize the entire record to see what it reveals about N–PAC's standing to secure declaratory relief. The record adequately evinces that N–PAC is an organization whose very purpose is to make political expenditures. It has done so for more than a decade, and it intends to do so in the future. Indeed, N–PAC typically spends all the money that it raises on political advocacy, and its outlays, past and prospective, at least arguably fall within the statutory definition of "independent expenditures."

It is, therefore, highly probable that N–PAC will at some point find itself either in violation of a statute that takes direct aim at its customary conduct or be forced to self-censor (i.e., withhold expenditures earmarked for funding expressive activity) for fear of the consequences. In such circumstances, a pre-enforcement facial challenge to a statute's constitutionality is entirely appropriate unless the state can convincingly demonstrate that the statute is moribund or that it simply will not be enforced.

New Hampshire has failed to make such a showing here. As the record reflects, an official in the Secretary of State's office told N–PAC's president that RSA 664:5, V would

be enforced and that violations would not escape notice. A representative of the Attorney General refused to disclaim the possibility of enforcement. As late as oral argument in this court, the defendants vouchsafed the constitutionality of the statute. Indeed, the defendants have not only refused to disavow RSA 664:5, V, but their defense of it indicates that they will some. day enforce it.

To sum up, there is more than enough in this record to show that the threat of future prosecution is not wholly conjectural, but, rather, that it is sufficiently credible to confer standing to launch a facial challenge to a recently enacted statute. Hence, we conclude that N–PAC has standing to challenge the constitutionality of New Hampshire's statutory scheme.

This conclusion is bolstered by a factual comparison between this case and cases in which the Supreme Court has found standing. As in *Babbitt,* 442 U.S. at 301–02, 99 S.Ct. at 2310–11, the plaintiff here has in the past and intends in the future to engage in conduct likely proscribed by a challenged statute. As in *Doe,* 410 U.S. at 188, 93 S.Ct. at 745, the statute in question is not a dead letter, and the defendants have not disclaimed any intention ever to enforce it. As in *American Booksellers,* 484 U.S. at 393, 108 S.Ct. at 643, the plaintiff must either risk criminal prosecution under a statute aimed directly at it or engage in self-censorship. Finally, as was the case in *Doe,* 410 U.S. at 188, 93 S.Ct. at 745, the lack of past prosecutions is irrelevant given the statute's recent origin.

Our holding finds additional support in a well-reasoned decision of the Eleventh Circuit. In that case, the plaintiff, a candidate for elected judicial office, brought a First Amendment challenge to a provision of the canons of judicial conduct that he believed would proscribe a campaign speech that he

wished to make. *See ACLU,* 999 F.2d at 1488. The defendants (persons charged with enforcement of the canons) responded that the rule did not apply to the plaintiff's proposed speech, but insisted that the rule itself was constitutional. In finding that the plaintiff had standing and that the defendants' representation did not render the issue moot, Judge Kravitch wrote:

> [I]t would be an anomalous result if [the defendants] were permitted to (1) maintain that Canon 7(B)(1)(a) is constitutional and enforceable and yet, if [the plaintiff] or another judicial candidate in [the plaintiff's] position were to seek pre-enforcement review, to (2) again come into court saying, 'Canon 7(B)(1)(a) does not apply to that proposed speech.' This process itself, aside from the canons and the rules, is enough to chill speech.

*Id.* at 1495.[6] These words have clear pertinence here.

### E

Because the 1996 primary election has been held, we must address a final issue pertaining to justiciability, namely, mootness. A "case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969). In our judgment, this case is not moot.

This conclusion stands on two pillars. In the first place, N–PAC seeks not only an injunction permitting certain planned expenditures but also a declaratory judgment as to the facial constitutionality of the statute. The latter prayer affects expenditures that N–PAC may choose to make in *future* elections. As to declaratory relief, then, the case is not moot. *See, e.g., Allende v. Shultz,* 845 F.2d 1111, 1114–15 (1st Cir.1988) (holding that, where the plaintiffs sought a declarato-

**6.** The defendants tell us that *ACLU* is undermined by the decision in *Graham v. Butterworth,* 5 F.3d 496 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2136, 128 L.Ed.2d 866 (1994). We do not agree. *Graham* is distinguishable on two bases. First, the *Graham* court itself set *ACLU* apart as involving a situation in which the defendants continued to maintain that the underlying rule was constitutional. *See id.* at 500.

Here, of course, the defendants, as in *ACLU,* argue that New Hampshire's statutory scheme passes constitutional muster. Second—and more salient—the *Graham* court concluded that there was no chance that the defendants there would enforce the challenged rule against the particular plaintiff. *See id.* at 499–500. That was not true in *ACLU,* and it is not an accurate statement as applied to this case.

ry judgment condemning the government's visa policy, the granting of one visa did not moot the case, as the government still had not disavowed its general policy).

In the second place, cases challenging statutes that touch upon the electoral process are *sui generis*. There often is insufficient time to resolve even a promptly filed case before the election is actually held. Mindful of that pitfall, the Supreme Court has tended to treat such challenges as coming within the exception to the mootness doctrine for cases that, though capable of repetition, may evade review. *See, e.g., Democratic Party v. Wisconsin*, 450 U.S. 107, 115 n. 13, 101 S.Ct. 1010, 1015 n. 13, 67 L.Ed.2d 82 (1981); *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 774, 98 S.Ct. 1407, 1414, 55 L.Ed.2d 707 (1978); *Storer v. Brown*, 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714 (1974).

To fall within this exception, "the challenged action [must be] in its duration too short to be fully litigated prior to its cessation or expiration," and there must be "a 'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur involving the same complaining party." *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (per curiam) (citations omitted). The instant case passes the *Murphy* test. As events to date demonstrate, challenges to election spending laws can rarely be fully resolved before the election itself is over. Moreover, N–PAC's resolve that it will continue to make expenditures which are arguably prohibited by RSA 664:5, V leads to a reasonable expectancy that N–PAC will again find itself in the same quandary involving the same statutory scheme. Hence, the case is not moot. *See Vote Choice*, 4 F.3d at 37 n. 12; *ACLU*, 999 F.2d at 1496.

## V. THE MERITS

■ Having confirmed N–PAC's standing to maintain this action, we must now decide whether to remand for further proceedings. When a trial court resolves a matter on a threshold ground and the appellate court reverses, the usual praxis is to remand for consideration of the merits. *See, e.g., In re Two Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 994 F.2d 956, 968–69 (1st Cir.1993); *Rivera–Gomez v. de Castro*, 843 F.2d 631, 634–35 (1st Cir.1988). Like most rules, however, this one admits of exceptions. Where the merits comprise a purely legal issue, reviewable de novo on appeal and susceptible of determination without additional factfinding, a remand ordinarily will serve no useful purpose. *See, e.g., United States v. Pierro*, 32 F.3d 611, 622 (1st Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 919, 130 L.Ed.2d 799 (1995); *Cohen v. Brown Univ.*, 991 F.2d 888, 904 (1st Cir. 1993); *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 642 (1st Cir.1992). So it is here. Accordingly, we reach the merits of N–PAC's constitutional challenge.

■ *Buckley* controls our analysis. There, the plaintiffs asseverated that several sections of the Federal Election Campaign Act (the FEC Act), 2 U.S.C. §§ 431–55, 18 U.S.C. §§ 591–610 (1995), violated their First Amendment rights. Among other things, they challenged a statutory cap ($1,000 per year) on the "independent expenditures" that individuals and groups could make "relative to a clearly identified candidate." *Buckley*, 424 U.S. at 7, 96 S.Ct. at 629. In evaluating the constitutionality of this provision, the Supreme Court first established a frame of reference: expenditure limitations, the Court said, "operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Id.* at 14, 96 S.Ct. at 632.

Public debate about candidates, the Court continued, is often fueled by money. *See id.* at 19, 96 S.Ct. at 634–35. As a consequence, any "restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* The FEC Act's ceiling on independent expenditures therefore represented a substantial restraint on political speech. *See id.* In the Court's evocative

metaphor, "[b]eing free to engage in unlimited political expression subject to a ceiling on expenditures is like being free to drive an automobile as far and as often as one desires on a single tank of gasoline." *Id.* at n. 18.

Having described the depth of the restriction involved, the *Buckley* Court proceeded to find that the government had not advanced a sufficiently compelling interest to warrant the severe First Amendment incursions associated with the proviso. The principal government interest asserted—avoiding corruption of the political process—could not justify the cap because independent expenditures, by definition, were made without consultation or cooperation between the contributor and the candidate. *See id.* at 45–47, 96 S.Ct. at 647–48. The Court likewise rejected the idea that expenditure limitations served a governmental interest in equalizing the ability of various groups to affect the outcome of elections. "The First Amendment's protection against governmental abridgement of free expression cannot properly be made to depend on a person's financial ability to engage in public discussion." *Id.* at 49, 96 S.Ct. at 649.

Under *Buckley*, RSA 664:5, V insults the First Amendment. The New Hampshire statute limits the same kind of independent expenditures that the FEC Act attempted to regulate, and the New Hampshire law purports to cap those expenditures at precisely the same level ($1,000) as the FEC Act set.[7] To be sure, the price of political expression has changed—but the changes work against the state's position. We take judicial notice that political campaigns are much more expensive now than when *Buckley* was decided two decades ago. The price of television and newspaper advertisements has ballooned, as have the costs associated with printing and distributing leaflets. To illustrate the point, N–PAC's plan to distribute 30,000 fliers at various public events held around the state on July 4, 1996, would have required that it spend in excess of $3,000. In our judgment, this single example makes painfully apparent how severely RSA 664:5, V restricts political speech. The First Amendment does not tolerate such drastic limitations of protected political advocacy.[8]

Our determination that the $1,000 per election limitation on independent expenditures is unconstitutional necessarily leads us to invalidate not only RSA 664:5, V, but also those portions of RSA 664:3, I & II which complement it. *See supra* Part I. One cannot be compelled to state that one will comply with an unconstitutional statute. Accordingly, neither the declaration requirement contained in RSA 664:3, I nor RSA 664:3, II's proviso conditioning the making of *any* independent expenditures on the filing of a declaration pledging that the committee will observe New Hampshire's $1,000 ceiling is enforceable. *See Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (explaining that, in the area of free speech, government may not indirectly deny, through unconstitutional conditions, that which it cannot directly prohibit).

## VI.  CONCLUSION

We summarize succinctly. N–PAC has established a credible threat that New Hampshire will enforce against it in future elections a statutory scheme that the state believes to be constitutional. Moreover, the statutes contain criminal penalties and suppress core activity protected by the First Amendment. We therefore conclude that N–PAC has suffered an actual injury and, consequently, we reverse the district court's dismissal of this case for lack of standing. Moreover, since New Hampshire's limitation on independent expenditures plainly violates

---

7.  We do not consider the distinction between the FEC Act's $1,000 annual limit and New Hampshire's $1,000 per election limit to be of constitutional consequence, especially since most elected state officials in New Hampshire serve two-year terms.

8.  At oral argument, counsel for the state argued that New Hampshire's particular system of campaign finance regulation, which places heavy emphasis on candidates' voluntary acceptance of spending limits, creates a uniquely compelling governmental interest in curbing independent expenditures. Accepting this argument would require us to carve out an unwarranted exception to a settled constitutional rule. We decline to do so. An organization's right to unfettered political expression and advocacy is just as substantial within New Hampshire as without.

**20**

the First Amendment, RSA 664:5, V is facially unconstitutional, and RSA 664:3, I and RSA 664:3, II, to the extent that they command fealty to RSA 664:5, V, are unenforceable. On remand, the district court shall enter an appropriate decree.

*Reversed and remanded.*