MacFarlane v. Kenison                    CV-98-353-M    08/31/99
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


James MacFarlane,
      Plaintiff

      v.                                      Civil No. 98-353-M

Leon S. Kenison,
      Defendant


                          O R D E R


     Pro se plaintiff, James MacFarlane, brings this action

against Leon Kenison, Commissioner of the New Hampshire

Department of Transportation, seeking $1 Million in compensatory

and $3 Million in punitive damages for alleged violations of his

First Amendment rights.  See 42 U.S.C. § 1983.  By prior order,

the court dismissed MacFarlane's claims against Kenison in his

official capacity, but allowed him to amend his complaint to sue

Kenison in his personal capacity.  Kenison now moves for summary

judgment, asserting that he did not violate MacFarlane's

constitutionally protected rights and, even assuming such a

violation, he is shielded from liability by qualified immunity.

MacFarlane objects.

## Background

The relevant facts appear to be largely undisputed. To the extent that they are contested, the court will, for the purpose of ruling on Kenison's motions for summary judgment, take them in the light most favorable to MacFarlane.

On June 5, 1998, the New Hampshire Supreme Court was scheduled to hear (and did, in fact, hear) oral argument in a case challenging the constitutionality of the legislature's so-called "ABC" plan, aimed at funding New Hampshire's public schools. Because the underlying issues generated substantial public interest, a sizeable audience, including members of the media, was expected to attend. Accordingly, the day before, MacFarlane went to the New Hampshire Department of Transportation ("D.O.T."), seeking Kenison's permission to engage in a peaceful one-man protest on the sidewalks and grounds located within the State Office Park, on Hazen Drive in Concord (both the D.O.T. and the Supreme Court buildings are located in that office park). Why MacFarlane approached Kenison for permission to demonstrate, rather than employees of the New Hampshire Supreme Court (where spectators, the media, and other activists were presumably planning to gather) is not entirely clear. Presumably,

MacFarlane intended to demonstrate adjacent to the D.O.T. building, close to the exit road from the Supreme Court building.

The record does not reveal what precise message he planned to share with his anticipated audience, but MacFarlane does say that he intended to park his van, which was "lawfully festooned with protest signs," walk around with a large sign, and distribute handbills which were generally critical of Supreme Court Chief Justice David Brock and Attorney Julia Nye. Plaintiff's objection to summary judgment (document no. 22), at 4-5.  See also Amended Complaint, para. 1.[1]

---

[1]     One of the handbills MacFarlane apparently sought to distribute was entitled "Legal Rubbish - By David Brock, NH Supreme Court 1990" and bears, among other things, the image of two kangaroos (presumably symbols of MacFarlane's perception that he was the victim of a so-called "kangaroo court").  The source of MacFarlane's displeasure with Chief Justice Brock and Attorney Nye (formerly counsel to MacFarlane) appears to stem from his belief that they engaged in improper conduct during the course of his state court divorce proceeding.  See MacFarlane v. Rich, 132 N.H. 608 (1989).  That displeasure has extended to several other individuals involved in that proceeding, including his former wife, various other attorneys, and at least one other state court judge.  MacFarlane has pursued several civil actions, both in this court and the United States District Court for the District of Maine, against each of them.  See, e.g., MacFarlane v. Crisp, No. 97-448-B (D.N.H. 1997); MacFarlane v. Rich, No. 96-572-JD (D.N.H February 23, 1998); MacFarlane v. Smith, No. 96-38-SD (D.N.H. November 27, 1997), aff'd, 1997 WL 696225 (1st Cir. November 10, 1997); MacFarlane v. McKean, No. 92-614-SD (D.N.H. June 26, 1996), aff'd, 1997 WL 471100 (1st Cir. August 19, 1997). See also MacFarlane v. McKean, No. 92-2390, 1993 WL 349674 (1st Cir. September 14, 1993).

3

In response to MacFarlane's request for permission to protest, Kenison reportedly said, "If you attempt to protest on D.O.T. grounds or anywhere around here, I will immediately have you arrested." Amended Complaint, para. 11. See also MacFarlane deposition at 49-51. Kenison denies that he ever threatened MacFarlane with arrest. Affidavit of Leon Kenison, para. 9. He does concede, however, that he refused to give MacFarlane permission to protest in the area around the D.O.T. building (as discussed more fully below, Kenison lacked authority to grant or withhold such permission). Id., at para. 3. In characterizing his brief interaction with Kenison, MacFarlane says, "His tone of voice was very stern and arrogant, and the prohibition [against protesting near the D.O.T. building] was absolute beyond all question or doubt or room for misinterpretation." Amended Complaint, para. 12. MacFarlane's description of the encounter is necessarily accepted for purposes of resolving this motion.

Having been rebuffed in his efforts to secure Kenison's permission to protest within the state office park, MacFarlane filed a petition for temporary restraining order in this court. On the morning of June 5, 1998 (the day of MacFarlane's planned demonstration), that petition was heard. Kenison, through counsel, explained that the State of New Hampshire has an

4

administrative policy which requires those who plan to demonstrate on state property to both complete an application and obtain a permit before doing so. And, because MacFarlane was seeking his permission to protest, Kenison says he reasonably inferred that MacFarlane had not followed the required permitting process.

Thus, Kenison suggests that his curt and, from MacFarlane's perspective, threatening comments were simply his way of letting MacFarlane know that: (a) he did not have authority to allow or prohibit MacFarlane's planned protest; and (b) if MacFarlane did not obtain the requisite permit from the appropriate state authorities, he would report MacFarlane's unauthorized conduct to appropriate law enforcement officials.

Kenison's abrupt and dismissive comments were taken by MacFarlane as a threat of arrest and an unlawful attempt to restrain his constitutionally protected right to engage in a peaceful protest on public property. Accordingly, he sought this court's intervention. At the hearing on MacFarlane's request for injunctive relief, counsel for Kenison represented that he had obtained copies of the requisite permit application and was prepared to assist MacFarlane in expediting the process of

5

obtaining permission to conduct his demonstration. MacFarlane, in turn, represented to the court that he did not intend to engage in any unlawful activities and said that he planned to conduct his protest in a peaceful, non-disruptive manner (e.g., not obstructing pedestrian walkways, keeping his vehicle clear of fire lanes and restricted parking areas, etc.). Perceiving no need for a restraining order, the court denied MacFarlane's petition.

MacFarlane then completed the application and obtained a permit to conduct his demonstration. Unfortunately, however, by the time he returned to the New Hampshire Supreme Court, oral arguments had concluded and his anticipated audience had moved on. MacFarlane was, therefore, able to conduct his demonstration, but with few, if any, people who might hear or see his message - hence, his rather substantial claim for compensatory and punitive damages.

## Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling upon a party's motion for summary judgment,

the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

**Discussion**

It is, perhaps, appropriate to begin with a discussion of what MacFarlane does not claim. He does not directly challenge the validity or constitutionality of the State's policy of requiring citizens to complete applications and obtain permits prior to conducting protests or demonstrations on public property; he has for example, not sued the state or the state agency or the public officials charged with reviewing applications and issuing permits. Instead, he merely claims that Kenison's alleged threat to have him arrested amounted to an unconstitutional prior restraint on his speech. And, to the extent that Kenison claims to have relied on New Hampshire's permitting policy in making that threat, MacFarlane simply asserts that such reliance was unreasonable.

Kenison disagrees and says, first, that his conduct in no way violated MacFarlane's constitutionally protected rights. Moreover, says Kenison, even if his alleged threat to contact the

7

police did actually violate MacFarlane's right of free speech, it was made in reliance upon the State's policy that all demonstrations of the sort planned by MacFarlane must be authorized by or, at a minimum, registered with the State. And, Kenison claims that his reliance on that policy was entirely reasonable and, therefore, he is shielded from liability by qualified immunity.

I.    Were MacFarlane's Constitutional Rights Violated?

The Supreme Court has directed that when a qualified immunity defense is asserted in a constitutional tort case, courts should first determine whether the plaintiff's constitutional rights were, in fact, violated. Only if it is first determined that a constitutional right was violated (or, in the case of a motion for summary judgment, that a genuine issue of material fact exists), should the court turn to the issue of qualified immunity. See County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998); Siegert v. Gilley, 500 U.S. 226, 232 (1991).

To state a viable claim under 42 U.S.C. § 1983, a plaintiff must establish that: (1) the defendant acted under color of state law; and (2) the official's conduct deprived the plaintiff of a right secured by the Constitution or a federal statute. See West

8

v. Atkins, 487 U.S. 42, 48 (1988). A public official acts under color of state law when he has "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Id., at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)). The Court of Appeals for the First Circuit recently addressed this issue and made it clear that not all action undertaken by a state actor is necessarily "under color of state law."

> [S]egregating private action from state action calls for a more sophisticated analysis. In general, section 1983 is not implicated unless a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or unless the conduct is such that the actor could not have behaved in that way but for the authority of his office. Thus, whether a [state actor] is acting under color of state law turns on the nature and circumstances of the [individual's] conduct and the relationship of that conduct to the performance of his official duties.
>
> * * *
>
> Even though "acting under color of law" includes "acting under pretense of law" for purposes of a state action analysis, there can be no pretense if the challenged conduct is not related in some meaningful way either to the officer's governmental status or to the performance of his duties.

Martinez v. Colon, 54 F.3d 980, 986-87 (1st Cir. 1995).

And, typically, in order to show that a deprivation of a First Amendment right has occurred, a plaintiff must, at a

9

minimum, demonstrate that the defendant intended to inhibit speech protected by the First Amendment, Tatro v. Kervin, 41 F.3d 9, 18 (1st Cir. 1994), and that the defendant's conduct had a chilling effect on the protected speech that was more than merely "speculative, indirect, or too remote." Sullivan v. Carrick, 888 F.2d 1, 4, (1st Cir. 1989).

MacFarlane has done little to demonstrate that Kenison was acting under color of state law when he allegedly threatened to call the police and have him arrested. Merely pointing out the obvious fact that Kenison is a state official is insufficient. See, e.g., Martinez v. Colon, 54 F.3d at 986 ("not every action undertaken by a person who happens to be a [state actor] is attributable to the state."). See also Parrilla-Burgos v. Hernandez-Rivera, 108 F.3d 445, 449 (1st Cir. 1997) ("it is not enough for an individual merely to purport to exercise official power in order to trigger § 1983 liability, but rather the individual must actually be engaged in the abuse of official power granted him by the government."). Instead, MacFarlane must demonstrate that Kenison's alleged threat was facilitated or "made possible only because [he] is clothed with the authority of state law." United States v. Classic, 313 U.S. at 326. He has failed to do so.

10

Even giving MacFarlane the benefit of the doubt, however, by assuming that Kenison acted under color of state law when he allegedly issued his threat, MacFarlane's claims still come up short. Given this record, it appears highly doubtful, at best, that Kenison actually violated MacFarlane's constitutionally protected rights by allegedly threatening to have MacFarlane arrested if he protested on state grounds. At the core of MacFarlane's complaint appears to be the mistaken view that he had an unconditional right to demonstrate on state property. See, e.g., Plaintiff's Supplemental Objection (document no. 29), at para. 11 ("Being threatened with arrest, and hence chilled from exercising First Amendment rights to walk upon a public sidewalk anyone is free to walk on, solely because one is carrying an expression-filled placard, is so obviously a constitutional violation that no more need be said on this subject.").

Of course, states can lawfully impose reasonable restrictions on the time, place, and manner of public demonstrations, provided such restrictions are not based upon the content of the message, are narrowly tailored to serve a significant governmental interest, and do not delegate overly broad licensing discretion to a government official. See, e.g.,

11

<u>Forsyth County, Georgia v. Nationalist Movement</u>, 505 U.S. 123, 130 (1992). The State of New Hampshire has purported to do just that. <u>See</u> Exhibits 3 and 4 attached to affidavit of Leon Kenison (submitted with document no. 28). To be sure, New Hampshire's efforts in that regard may have been haphazard and certainly could have been accomplished in a better way.[2]

Nevertheless, the question before the court is not whether the State's administrative policy is unconstitutionally broad or overly restrictive. Rather, it is whether Kenison violated MacFarlane's constitutional rights by implicitly invoking that policy and informing MacFarlane that, if he conducted a demonstration (sans permit), Kenison would contact the appropriate law enforcement officers and seek his arrest. As noted earlier, it is highly unlikely that such conduct violated MacFarlane's rights. Kenison's threat to call the police and have MacFarlane arrested if MacFarlane engaged in what a reasonable person in Kenison's position could legitimately

_____

[2] For example, it is entirely unclear whether the State has complied with its own laws - the administrative rule which requires citizens to prepare and submit a permit application to the Department of Administrative Services may not have been published in the State's administrative regulations. <u>See generally</u> N.H. Rev. Stat. Ann. 541-A:15 and 16. And, the rule itself is somewhat vague as to its scope (e.g., describing state property it applies to).

12

understand to be unlawful conduct, does not rise to the level of unlawful or unconstitutional conduct. See, e.g., Shangri-La Enterprises, Ltd. v. Brennan, 483 F.Supp. 281, 284 (E.D. Wis. 1980) ("the mere threat to enforce this constitutional ordinance is not evidence of an impermissible government purpose to chill freedom of expression.") Cf. N.H. Right to Life Political Action Committee v. Gardner, 99 F.3d 8, 13 (1st Cir. 1996) (holding that the threat to enforce an arguably unconstitutional statute may give rise to standing to challenge that statute - an issue not relevant in this proceeding).

Stated somewhat differently, the record suggests that under existing New Hampshire law MacFarlane did not have the absolute right to engage in his protest without having first notified the State of his plans and submitted a permit application. He failed to do so and does not challenge the permitting scheme. Thus, it is difficult to imagine how Kenison's alleged threat to contact the police if MacFarlane conducted his protest in violation of the State's permitting policy amounted to an unlawful chilling of protected speech.

Suppose, for example, someone announced to a Secret Service agent his intention to send a threatening letter to the President

13

and the Secret Service agent responded by threatening him with arrest if he did so. The individual's speech may very well have been chilled by that threat, just as it might be chilled by the mere presence of laws which prohibit the mailing of threatening communications. See, e.g., 18 U.S.C. § 871 (prohibiting the delivery of threats against the president); 18 U.S.C. § 876 (generally prohibiting the mailing of threatening communications). And, to be sure, the threatened enforcement of that statute might vest the individual with standing to challenge it. Nevertheless, because speech of that sort is subject to lawful restrictions (even outright prohibitions), he could hardly claim that his constitutional rights were violated.

Plainly, MacFarlane's situation is distinct from the hypothetical above, insofar as the intended content of his speech was likely protected by the First Amendment. The means by which he proposed to deliver that speech (protest on public property used for governmental purposes), however, can be (and, in fact is) subject to reasonable limitations. And, MacFarlane has failed to demonstrate that the threat to seek enforcement of those limitations, even if that threat actually chilled his speech, gives rise to a viable constitutional deprivation claim under § 1983. It is also important to note that Kenison, unlike

14

the Secret Service Agent in the hypothetical above, lacked any actual (or even apparent) authority to arrest.  At best, his alleged threat can be viewed as a warning that he intended to summon the police.

There is, however, an added dimension to MacFarlane's claim. He seems to suggest that Kenison violated his constitutionally protected rights, not merely by implicitly invoking the State's permit policy, but by then failing to inform him of the details of that policy and/or neglecting to disclose the agency from which he could obtain the requisite permit.  See, e.g., Plaintiff's Objection (document no. 22), at para. 5 ("Defendant did not tell Plaintiff of any reasonable time, place, or manner in which Plaintiff could exercise his First and Fourteenth Amendment rights under the United States Constitution.") (emphasis in original); Plaintiff's Supplemental Objection (document no. 29) at para 8 ("In any event, if Defendant Kenison believed this "Policy" was in force and effect, he should have told Plaintiff MacFarlane to make application for a permit under it.  He did no such thing: he never mentioned to MacFarlane that any such "Policy" existed").

15

Kenison was, however, under no legal obligation to provide MacFarlane with that information. Of course, it would have been helpful if he had done so. But, his failure to explain the mechanics of a policy with which he may have had little familiarity does not amount to a violation of MacFarlane's constitutionally protected right of free speech (even when combined with his alleged threat to summon the police). Kenison is, after all, the Commissioner of the Department of Transportation, a job which does not encompass issuing permits to people planning to protest on state property.

To resist summary judgment, MacFarlane bears the burden of demonstrating that, by implicitly invoking that policy and failing to inform MacFarlane of how he might obtain the requisite permit, Kenison violated his free speech rights (or, at a minimum, that there is a genuine issue of material fact relevant to that question). He has failed to do so.

II. Qualified Immunity.

Finally, even if MacFarlane were able to demonstrate that there is a genuine issue of material fact concerning whether Kenison: (a) acted under color of state law; and (b) violated MacFarlane's First Amendment rights, Kenison would still be

16

entitled to judgment as a matter of law on grounds of qualified immunity. A government official is entitled to qualified immunity if the challenged "'conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Aversa v. United States, 99 F.3d 1200, 1214 (1st Cir. 1996) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The challenged conduct is measured by a standard of objective reasonableness, that is: "Could an objectively reasonable official, situated similarly to the defendant, have believed that his conduct did not violate the plaintiff['s] constitutional rights, in light of clearly established law and the information possessed by the defendant at the time of the allegedly wrongful conduct?" Wood v. Clemons, 89 F.3d 922, 927 (1st Cir. 1996). See also Brady v. Dill, ___ F.3d. ___, 1999 WL 508812 at *10 (1st Cir. July 22, 1999) (holding that for a right to be clearly established, "the law must have defined the right in a quite specific manner, and [] the announcement of the rule establishing the right must have been unambiguous and widespread, such that the unlawfulness of particular conduct will be apparent ex ante to reasonable public officials."). Importantly, a defendant does not lose the protection of qualified immunity if he acts mistakenly, as long as his mistake was objectively reasonable, as qualified immunity is intended to

17

protect "'all but the plainly incompetent or those who knowingly violate the law.'" <u>Veilleux v. Perschau</u>, 101 F.3d 1, 3 (1st Cir. 1996) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).

To undermine Kenison's invocation of qualified immunity, MacFarlane must first demonstrate that the constitutional right allegedly infringed was "clearly established." <u>See generally</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 639-40 (1987) (holding that the right allegedly violated must have been "clearly established" in a "particularized" sense and "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" at the time of the incident). While the contours of MacFarlane's First Amendment right to freedom of speech may, generally speaking, be said to be "clearly established," his claimed absolute entitlement to exercise that right on state property, free from any limitations, is not. In fact, just the opposite is true: the law is clearly established that one's freedom of speech is not completely unbridled, and states may, under appropriately limited circumstances, impose reasonable restrictions on the time, manner, and place of proposed public demonstrations.[3]

---

[3] Generally speaking, courts have recognized three categories of public fora: the traditional public forum, such as public streets and parks; the government-designated public forum;

18

The Supreme Court has repeatedly made clear that, depending upon the nature of the forum at issue, states may impose reasonable, narrowly tailored, content neutral restrictions on proposed public demonstrations. Thus, it was "clearly established" that the State of New Hampshire could impose such restrictions on public protests of the sort MacFarlane planned. And, Kenison's unrefuted testimony is that he reasonably believed that MacFarlane planned to conduct a public demonstration without the required State approval.[4]

and, finally, the non-public forum. Restrictions on the public's right to peacefully protest at these locations are subject to differing levels of constitutional scrutiny. See generally United States v. Gilbert, 130 F.3d 1458, 1461 (11th Cir. 1997), cert. denied, 118 S.Ct. 1547 (1998). The record in this case suggests, and the court has assumed, that MacFarlane proposed to engage in his protest exclusively on a public and/or government-designated public forum.

    [4]    MacFarlane does not allege that Kenison's actions were motivated by any disagreement with, or intent to suppress the content of MacFarlane's speech. In fact, there is no evidence that Kenison knew of or cared about MacFarlane's intended message. See, e.g., MacFarlane deposition at 39. Nor is this a case in which the defendant is charged with retaliating or discriminating against plaintiff for having previously engaged in protected speech. Thus, Kenison's subjective motivation in threatening to summon police is largely irrelevant. Cf. Broderick v. Roache, 996 F.2d 1294, 1298 (1st Cir. 1993) (holding that where intent is an integral element of a party's claim under the First Amendment, the objective reasonableness of the defendant's conduct is not outcome determinative and, instead, the court must focus on the defendant's true motivations). Nevertheless, to the extent that Kenison's subjective intent is relevant, MacFarlane has failed even to allege that Kenison was motivated by an intent to suppress the content of his speech, as opposed merely insuring that no unauthorized demonstration

19

It perhaps bears repeating that Kenison was neither empowered to authorize MacFarlane's demonstration, nor to issue the requisite permit.  Thus, he simply informed MacFarlane (albeit in a somewhat curt and largely unhelpful way) that, if he conducted his planned unauthorized protest without such a permit, Kenison would call law enforcement officers and seek his arrest. Of course, the decision to question, detain, cite, or even arrest MacFarlane would have been up to the responding officers.  They, not Kenison, would have been responsible for deciding whether MacFarlane's conduct violated the State's permit policy and, if so, whether his conduct warranted his arrest (e.g., disorderly conduct, trespass, etc.).

The confrontation that unfolded in the offices of the Department of Transportation on June 4, 1999 was, therefore, very different from circumstances in which a law enforcement officer (plainly vested with arrest authority) chills a citizen's exercise of free speech by threatening to arrest him or her for an alleged breach of a plainly unconstitutional municipal ordinance.  All Kenison knew (or can reasonably be charged with knowing) is that: (a) states can impose reasonable restrictions on citizen's rights to engage in protests on public property

occurred in the office park.

20

(including the imposition of permitting requirements); (b) the State of New Hampshire imposed restrictions and required those planning to engage in public protests on state property to obtain a permit; and (c) MacFarlane had no permit and, apparently in lieu of a permit, was seeking Kenison's permission to demonstrate on state property. A reasonable state official in Kenison's position would not have believed that, by threatening to summon police and seek MacFarlane's arrest if he engaged in an unauthorized protest on state property, he would have been violating MacFarlane's constitutional right to free speech. And, notwithstanding MacFarlane's assertions to the contrary, there is no credible evidence in the record which even suggests that Kenison knew or reasonably should have known that the State's policy of requiring demonstrators to obtain permits before demonstrating on State property might itself violate the First Amendment.

And, even if MacFarlane had attempted to show that the State's permitting policy was unconstitutional, he would have fared no better. See, e.g., Grossman v. City of Portland, 33 F.3d 1200 (9th Cir. 1994). The defendant in Grossman was a police officer charged with violating the plaintiff's right to freedom of speech when he arrested plaintiff for violating a

21

municipal ordinance requiring those who planned to demonstrate in a city park to first obtain a permit.  Here, the situation is one step removed from Grossman; Kenison lacked any apparent arrest authority and merely threatened to contact police officers and urge arrest, but the officers would necessarily make an independent assessment of: (a) whether MacFarlane was in violation of the State's permit requirement; and (b) whether that permit requirement was so obviously infirm from a constitutional standpoint that, notwithstanding MacFarlane's transgression, they should neither arrest him nor interfere with his demonstration. Nevertheless, the Grossman opinion is instructive.

> Unlike in many such cases, here the allegedly
> unconstitutional action undertaken by the individual
> defendant consists solely of the enforcement of an
> ordinance which was duly enacted by the city council.

> * * *

> As with most legal matters, there are no absolutes
> here. . . In the end, however, an officer who
> reasonably relies on the legislature's determination
> that a statute is constitutional should be shielded
> from personal liability.

> Applying these principles, we conclude that Davis's
> actions in arresting Dr. Grossman pursuant to [the
> municipal ordinance] was "objectively legally
> reasonable."  . . . [T]he record makes clear that Davis
> made the decision to arrest the doctor largely because
> he and his colleagues did not have a permit to
> demonstrate in the park, and Davis correctly believed
> that a city ordinance required one.  Dr. Grossman's
> conduct was in fact proscribed by [that ordinance].
> Thus, there is no doubt from the record that Davis had

22

probable cause to arrest him under that section.  Dr. Grossman and his group unquestionably violated the terms of the ordinance . . . Finally, it was objectively reasonable for Davis to rely on the constitutionality of the ordinance requiring permits for the use of the park.  This ordinance . . . was not so obviously unconstitutional as to require a reasonable officer to refuse to enforce it.  City councils have authority, consistent with the First Amendment, to adopt certain time, place, and manner restrictions regulating the use of public parks by groups, including in some circumstances narrowly tailored permit requirements.  Thus, Davis was reasonably entitled to rely on the city council's judgment that it was lawful to require a group desiring to use the park to obtain a permit.

Id., at 1209-10 (citations omitted).


In the end, even if MacFarlane could show that Kenison's conduct unconstitutionally chilled his exercise of First Amendment rights, he could not demonstrate that Kenison's reliance on the State's permit requirement was unreasonable. That policy is not so plainly unconstitutional that a reasonable state actor in Kenison's position would or should have realized that a threat to call police to enforce it against MacFarlane would likely violate his constitutional rights.  Consequently, Kenison is entitled to qualified immunity.


**Conclusion**

Kenison is entitled to judgment as a matter of law.

23

MacFarlane has failed to demonstrate that his constitutionally protected rights were actually violated by Kenison's conduct. Moreover, even if MacFarlane were able to overcome that hurdle, Kenison is plainly entitled to the protections of qualified immunity.

Defendant's motions for summary judgment (documents no. 21 and 28) are granted. The Clerk of the Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

August 31, 1999

cc:  James MacFarlane
     Mark P. Hodgdon, Esq.

24