USCA1 Opinion

 

United States Court of Appeals

For the First Circuit

No. 02-1669

TOMÁS DE JESÚS MANGUAL,

Plaintiff, Appellant,

JORGE MEDINA; CARIBBEAN INTERNATIONAL NEWS CORPORATION,

Movants, Appellants,

v.

ANGEL E. ROTGER-SABAT, Secretary of Justice of the Commonwealth
of Puerto Rico; JOHN DOE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Lynch and Howard, Circuit Judges, 

and Shadur, Senior District Judge. (1)

 Juan R. Marchand Quintero on brief for Appellants.

 Roberto J. Sánchez Ramos and Camelia Fernández Romeu,
Office of the Solicitor General of the Commonwealth of Puerto Rico,
on brief for Appellees.

January 21, 2003

 LYNCH, Circuit Judge. A newspaper reporter threatened
with prosecution for articles he had published about government
corruption brought suit in 1999 challenging the Puerto Rico
criminal libel statute as unconstitutional under the First
Amendment. Three other reporters, including one who had been
prosecuted under the statute and another who had been threatened,
sought to intervene on the plaintiff's side, along with a newspaper
and the Overseas Press Club. The plaintiff sought declaratory and
injunctive relief and at the outset moved for summary judgment on
the ground that the statute is plainly unconstitutional. The
district court dismissed the suit in 2002, finding no jurisdiction
due to standing, ripeness and mootness concerns. We hold that the
district court was in error as to its standing, ripeness and
mootness rulings and that the criminal libel statute is
unconstitutional as applicable to statements regarding public
officials and public figures.

I. Factual Background

 In 1974, Puerto Rico enacted a criminal defamation
statute, in articles 118 to 121 of the Penal Code. 33 P.R. Laws
Ann. §§ 4101-4104 (2001). The full text of the statute, as
officially translated, reads:

 § 4101. Libel

 Any person who maliciously, by any means, or in
any way, publicly dishonors or discredits, or charges the
commission of an act constituting a crime, or impugns the
honesty, integrity, virtue or reputation of any natural
or juridical person, or who blackens the memory of one
who is dead, shall be punished with a term of
imprisonment of not more than six (6) months, a fine of
not more than five hundred dollars ($500), the penalty of
restitution, or any combination of these, at the
discretion of the court. However, the court may impose
the penalty of rendering community service in lieu of the
term of imprisonment. (2)

 § 4102. Truth as defense

 In all criminal prosecutions for libel, the truth
shall constitute a defense and the accused shall be
acquitted, provided it is proven that the charge made is
true and he had good intention and justifiable ends.

 If the victim is a public officer and the charge
made refers to the performance of his duties, or if what
was related or published refers to matter of public
interest, the accused shall be acquitted whenever it is
proven that the charge made is true; Provided, That if
the charge made is false, said accused shall not be
acquitted, if it is proven that he acted knowing the fact
to be false and with gross and obstinate contempt of the
truth.

 § 4103. Report of official acts

 No report or statement, which is true and fair, of
any judicial or legislative act, or of any other official
character, nor of statements, arguments and debates had
[contained] therein shall be considered to be libelous.

 § 4104. Diffusion of conviction 

 The trial court shall order the diffusion of the
conviction through the same means used by the offender or
through any other analogous or similar nature, and at the
latter's expense. 

Id.

 The Puerto Rico newspaper El Vocero de Puerto Rico ("El
Vocero") is published by Caribbean International News Corporation
("Caribbean"). In 1995, Caribbean created an internal division of
El Vocero, the Editorial Investigations Division, which was
designed to investigate matters of public concern, such as police
brutality, government corruption, and the like. Obed Betancourt,
a reporter for El Vocero since 1995, was transferred to this
division in June 1998 and assigned to investigate allegations that
the Narcotics Squad of the Caguas police had been infiltrated by
organized crime. Betancourt wrote a series of articles reporting
on these allegations, including evidence that a drug dealer who was
targeted by the Narcotics Squad helped to organize its Christmas
party and was paying bribes to officers.

 Of particular importance for our purposes is Betancourt's
article published on August 18, 1998. This article reported the
allegation, made during an internal police administrative hearing,
that Officer Elsa Rivera Colón, an agent with the Narcotics Squad,
was having an affair with that same drug dealer. The purpose of
publishing this information, according to Betancourt, was to
explain why so many drug cases in Caguas were dismissed -- because
the Narcotics agents did not appear to testify -- and how
confidential information was leaked to investigation targets. The
article also touched on Officer Rivera's fitness for police duty.

 On September 10, 1998, Officer Rivera filed a civil
action for libel against both Betancourt and El Vocero. On
February 26, 1999, she also filed a complaint with the Caguas
police against Betancourt for criminal libel under section 4101 and
later urged the local district attorney to bring charges against
Betancourt. Subsequently, she persuaded a fellow Caguas police
officer to file a similar complaint and to secure his supervisor's
signature on it. The case was then transferred to San Juan, where
the newspaper's offices are located.

 Betancourt and El Vocero filed suit in federal court,
requesting declaratory judgment that the criminal libel statute is
unconstitutional under the First Amendment. (3) Betancourt averred
that he has refrained from further investigating political
corruption for fear of being prosecuted again. On August 4, 1999,
a federal district judge issued an order prohibiting the
prosecution of the charges against Betancourt while the declaratory
judgment motion was before the court. In violation of that federal
order, a police officer in San Juan brought the criminal libel
charge against Betancourt on August 12, 1999; thus, four police
officers in two departments were involved in initiating
prosecutions. That same day Betancourt was forced to appear and
testify at a probable cause hearing. The prosecution made no
effort to put on evidence as to falsehood or reckless disregard for
the truth. Cross-examination demonstrated that neither prosecution
witness could establish anything about the truthfulness of the
articles. The Puerto Rico court judge found no probable cause, and
the criminal case was dismissed against Betancourt. Thereafter,
the federal district court dismissed the federal declaratory
judgment case as moot. El Vocero v. Fuentes Agostini, No. 99-1272
(D.P.R. Sept. 14, 1999).

 Tomás de Jesús Mangual, the plaintiff in this case, is
another reporter for El Vocero and was assigned to cover the Caguas
police and courts. For over thirteen years he has written
extensively on the subject of the corruption of government
officials in the Caguas region, often identifying individual
officials as corrupt and under the influence of drug traffickers. 
Mangual investigated the criminal libel complaint against
Betancourt and wrote four articles on the subject between March 11
and 16, 1999. In these articles, Mangual accused the Caguas
police, including Rivera, of being corrupt and of pursuing the
libel charge against Betancourt in an attempt to silence him.

 Mangual also made several accusations specifically
against Officer Rivera, in addition to the charge that she had
trumped up criminal charges against Betancourt in retaliation for
his 1998 articles. The first was that Rivera was linked to drug
traffickers, the same charge earlier made by Betancourt, and that
she was under investigation as a result. The second was that
Rivera had been conducting an adulterous affair with her married
superior and had given birth to his child. This latter allegation
was meant to explain Rivera's influence over the Caguas police. 
The articles asserted that she had managed to achieve a transfer to
the drug unit in violation of normal procedures and had used her
position to retaliate against officers who complained about her. 
Mangual wrote that the chief of the anti-corruption unit of the
Puerto Rico police had instituted an investigation into a number of
complaints against Rivera, and it was possible that probable cause
to charge her would be found.

 Officer Rivera responded to these articles by writing a
letter to the Secretary of Justice on April 12, 1999. The letter
notified Fuentes that "I am prepared not only to file the criminal
charges that concern [Betancourt and Mangual], but also to bring
this suit on its merits, up to the ultimate legal consequences." (4) 
This reference was to the filing of criminal libel charges against
the two reporters. She complained of procedural anomalies in the
handling of her prior criminal libel complaint against Betancourt,
including the transfer of the case to San Juan, and requested an
investigation "so that summons be issued for this case for the
corresponding legal process."

 The Assistant Attorney General, Edwin O. Vázquez Berrios,
responded by letter to Officer Rivera. Vázquez noted that in cases
such as this one, the Puerto Rico police investigate and file
charges if necessary; the Department of Justice intervenes only
after there has been a determination of probable cause and the case
has been scheduled for trial. Accordingly, he forwarded the letter
and the materials Rivera attached to the Superintendent of the
Police "for any action he may deem pertinent." He did not inform
either Officer Rivera or the Superintendent of the Police that the
Department of Justice would not support prosecution in this matter,
nor did he warn them that there may be constitutional infirmities
in a prosecution.

 Mangual's complaint stated he feared "prosecution by at
least Officer Rivera, and possibly by other persons whose interest
is obstructing publications regarding official corruption." 
Mangual also verified that he felt the effects of the threat of
prosecution after the March 1999 articles. Police officers at
Caguas Police Headquarters were being pressured not to give
information to Mangual and were afraid to even be seen with him,
seriously interfering with his work as a journalist.

 There have been at least two other prosecutions under the
criminal libel statute in the first six months of 2001. One of the
complaints was brought on behalf of a Police Department lieutenant;
the defendant was convicted and fined. In both cases, district
attorneys from the Department of Justice were prosecuting. Neither
case involved journalists or other members of the press. Details
about the threats to the putative intervenors are discussed below.

II. History of the Case

 On September 17, 1999, Mangual filed a verified complaint
in the U.S. District Court for the District of Puerto Rico,
requesting that the court declare sections 4101 to 4104
unconstitutional under the First Amendment. He also requested
injunctive relief if necessary to protect his and others' First
Amendment rights. With his complaint, Mangual filed a motion for
summary judgment and a motion for an order to show cause and for
expedited resolution. The suit named José Fuentes Agostini, the
Secretary of Justice of the Commonwealth of Puerto Rico at the time
of the initiation of the suit. Fuentes has since resigned, and he
has been replaced as the defendant by the new Secretary of Justice,
Angel Rotger-Sabat. See Fed. R. Civ. P. 25(d)(1). The suit also
names John Doe as a defendant, to stand for any person who may be
indispensable to the equitable relief requested.

 Secretary Fuentes responded on October 18, 1999 by
requesting the dismissal of the case for lack of jurisdiction. The
Secretary also filed a memorandum opposing the plaintiff's motion
for summary judgment. On May 2, 2000, Fuentes, no longer the
Secretary, moved to dismiss the case entirely on the additional
jurisdictional ground of mootness, because no criminal charges had
been filed against Mangual, and the one-year statute of limitations
had expired on March 17, 2000. See 33 P.R. Laws Ann. § 3412(b).

 On May 11, 2000, two persons and an association moved to
intervene as party plaintiffs under Fed. R. Civ. P. 24(a)
(intervention of right). Two were reporters: Betancourt and Manny
Suárez, who was a reporter for the San Juan Star, a New York
Times stringer, and a professor of journalism. The third party was
the Overseas Press Club, a nonprofit association of journalists,
which said it had polled its members in the aftermath of the
Betancourt prosecution and found that they feared criminal libel
prosecution by the police even more than physical aggression. As
a result, the Club claimed, its members were withholding
publication of articles. The motion to intervene included
affidavits from Betancourt, describing his prosecution, and Suárez,
describing the chilling effect that prosecution had on his own
journalism. Suárez said, "I am in a catch-22 situation, damned if
I do, damned if I don't. Clearly, the alternative to not living
under the risk of prosecution for libel . . . is not to publish. 
But, is this not a 'chilling effect'?" The district court denied
these parties status as intervenors (5) but granted them leave to file
an amicus brief, which they did. On July 24, 2000, the case was
transferred from Judge Daniel Domínguez to Judge Jay A. García-Gregory.

 On October 27, 2000, Caribbean and Jorge Medina, another
journalist who wrote for El Vocero, filed an application to
intervene as plaintiffs under Fed. R. Civ. P. 24(b) (permissive
intervention). The application to intervene included an affidavit
from Medina. The application was in part based on a threat of
prosecution which had been leveled at Medina. Medina wrote three
articles in October 2000 in El Vocero involving allegations of
certain conduct by a Puerto Rico gubernatorial candidate. The
candidate's campaign director, at a press conference, announced the
filing of a civil suit against Medina and threatened to file a
criminal complaint. The campaign director stated that the
publications constituted criminal libel and such actions were a
felony punishable by jail. Medina was present and felt threatened.

 On March 28, 2002, the district court dismissed Mangual's
case, and denied Medina and Caribbean's motions to intervene, for
lack of subject matter jurisdiction. The court held that the
plaintiff and intervenors all lacked standing to sue, and that the
plaintiff's claims were both unripe and moot. Mangual v. Fuentes
Agostini, 203 F. Supp. 2d 78, 81 (D.P.R. 2002). Mangual appeals
the dismissal of his claim, and Medina and Caribbean appeal the
denial of their motion to intervene.

III. Legal Analysis

 Challenges to subject matter jurisdiction based on
standing, ripeness, and mootness are often pure matters of law, and
thus engender de novo review. Valentin v. Hosp. Bella Vista, 254
F.3d 358, 363 (1st Cir. 2001); N.H. Right to Life PAC v. Gardner,
99 F.3d 8, 12 (1st Cir. 1996). The party invoking federal
jurisdiction has the burden of establishing that it exists. R.I.
Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 30 (1st Cir.
1999). For the purposes of reviewing the district court's rulings,
we accept as true all material allegations in the complaint and
intervenors' motions and construe them in favor of the plaintiff
and intervenors. See Pennell v. San Jose, 485 U.S. 1, 7 (1988);
Warth v. Seldin, 422 U.S. 490, 501 (1975). There are no material
facts in dispute.

A. Justiciability of Plaintiff's Claim

 1. Standing

 a. Legal Standards

 The doctrine of standing is of both constitutional and
prudential dimension. See Barrows v. Jackson, 346 U.S. 249, 255-56
(1953). The necessity to establish constitutional standing is
rooted in the case or controversy requirement of the Constitution. 
See U.S. Const. art. III, § 2. "[T]he standing question is whether
the plaintiff has 'alleged such a personal stake in the outcome of
the controversy' as to warrant his invocation of federal-court
jurisdiction and to justify exercise of the court's remedial powers
on his behalf." Warth, 422 U.S. at 498-99 (quoting Baker v. Carr,
369 U.S. 186, 204 (1962)).

 The burden to establish standing lies with the party
invoking federal jurisdiction. Bennett v. Spear, 520 U.S. 154,
167-68 (1997). A plaintiff must show:

 that (1) he or she personally has suffered some actual or
threatened injury as a result of the challenged conduct;
(2) the injury can be fairly traced to that conduct; and
(3) the injury likely will be redressed by a favorable
decision from the court.

N.H. Right to Life, 99 F.3d at 13 (internal citations omitted); see
Valley Forge Christian Coll. v. Ams. United for Separation of
Church and State, Inc., 454 U.S. 464, 472 (1982).

 A paradigm of a case or controversy under Article III is
a challenge to a statute that imposes criminal penalties for
constitutionally protected activities by a person likely to be
subject to the statute. Diamond v. Charles, 476 U.S. 54, 64
(1986). A party need not violate the statute and suffer the
penalty in order to generate a conflict worthy of standing in
federal court. Babbitt v. United Farm Workers Nat'l Union, 442
U.S. 289, 298 (1979). In challenges under the First Amendment, two
types of injuries may confer Article III standing without
necessitating that the challenger actually undergo a criminal
prosecution. The first is when "the plaintiff has alleged an
intention to engage in a course of conduct arguably affected with
a constitutional interest, but proscribed by [the] statute, and
there exists a credible threat of prosecution." Id. Plaintiffs
may have standing even if they have never been prosecuted or
threatened with prosecution. Doe v. Bolton, 410 U.S. 179, 188
(1973). The second type of injury is when a plaintiff "is chilled
from exercising her right to free expression or forgoes expression
in order to avoid enforcement consequences." N.H. Right to Life,
99 F.3d at 13; see Virginia v. Am. Booksellers Ass'n, Inc., 484
U.S. 383, 393 (1988); Meese v. Keene, 481 U.S. 465, 473 (1987). 
Plaintiffs need not place themselves "between the Scylla of
intentionally flouting state law and the Charybdis of forgoing
. . . constitutionally protected activity." Steffel v. Thompson,
415 U.S. 452, 462 (1974).

 A plaintiff's subjective and irrational fear of
prosecution is not enough to confer standing under Article III for
either type of injury. See Laird v. Tatum, 408 U.S. 1, 13-14
(1972) ("[A]llegations of a subjective 'chill' are not an adequate
substitute for a claim of specific present objective harm or a
threat of specific future harm."). Both the injury based on threat
of prosecution and the injury based on self-censorship depend on
"the existence of a credible threat that the challenged law will be
enforced." N.H. Right to Life, 99 F.3d at 14. Put another way,
the fear of prosecution must be "objectively reasonable." R.I.
Ass'n of Realtors, 199 F.3d at 31; see also N.H. Right to Life, 99
F.3d at 14.

 As to whether a First Amendment plaintiff faces a
credible threat of prosecution, the evidentiary bar that must be
met is extremely low. "[C]ourts will assume a credible threat of
prosecution in the absence of compelling contrary evidence." Id.
at 15. The Supreme Court has often found standing to challenge
criminal statutes on First Amendment grounds even when those
statutes have never been enforced. See, e.g., Babbitt, 442 U.S. at
302; Doe, 410 U.S. at 188; see also R.I. Ass'n of Realtors, 199
F.3d at 32 (finding a credible threat of prosecution under a
statute that had never been enforced, in part because it was
enacted "only twenty years ago"). A finding of no credible threat
of prosecution under a criminal statute requires a long
institutional history of disuse, bordering on desuetude. See Poe
v. Ullman, 367 U.S. 497, 501, 507 (1961) (denying standing based on
an eighty-year-old "tacit agreement" by the state not to
prosecute).

 b. Application of Standards

 The district court correctly found that Mangual meets
both the second prong of the standing test, "causation," and the
third prong, "redressability." Mangual, 203 F. Supp. 2d at 84. 
There is no question that if an injury exists, it is caused by the
criminal libel statute. Redressability is also not in question;
when a statute is challenged as unconstitutional, the proper
defendants are the government officials whose role it is to
administer and enforce it. See Diamond, 476 U.S. at 57 n.2. The
district court incorrectly found, however, that Mangual fails the
"injury in fact" requirement because there is no "credible threat
of prosecution." Mangual, 203 F. Supp. 2d at 84 (quoting Babbitt,
442 U.S. at 298).

 We think it apparent that Mangual has standing to
challenge Puerto Rico's criminal libel statute. In his complaint,
Mangual asserts standing under both alternative prongs of the N.H.
Right to Life standing rubric. First, Mangual faced and continues
to face a real threat of prosecution. "The existence of federal
jurisdiction ordinarily depends on the facts as they exist when the
complaint is filed." Newman-Green, Inc. v. Alfonzo-Larrain, 490
U.S. 826, 830 (1989); see Becker v. FEC, 230 F.3d 381, 386 n.4 (1st
Cir. 2000). At the time this action was brought, Mangual was under
actual threat of prosecution by Officer Rivera, a threat that was
surely a credible one; furthermore, the Department of Justice
advanced the prosecution when it forwarded Rivera's complaint to
the local police. There is no question Mangual had standing at
that time.

 Mangual also has standing based on other factors. He
states an intention to continue covering police corruption and
writing articles similar to those which instigated Rivera's threat
of prosecution. He asserts that there are several other
individuals who have been mentioned in published articles he has
authored who are inclined to prosecute him for criminal libel. The
investigations into these individuals are ongoing, and further
articles will be written, exacerbating Mangual's exposure to a
criminal libel prosecution. Thus, even discounting Rivera's threat
of prosecution, Mangual has shown a credible threat of prosecution
for continuing his work as a journalist.

 Second, Mangual asserts the existence of a "chilling
effect of a very serious nature" on his investigative reporting due
to the possibility of prosecution. The effect of the statute, as
alleged by Mangual, has been severe. While insurance is available
to cover civil libel cases, none is available to cover the legal
fees or fines resulting from criminal libel charges. As a result,
there is nothing Mangual can do to limit his exposure other than to
curtail his investigative and journalistic activities. Mangual
also says there is a danger his sources will silence themselves if
he is criminally prosecuted and forced to disclose his sources to
prove the truth of his allegations. The threat of prosecution
against Mangual, and the ensuing chilling effect, certainly exceed
the low probability threshold required for First Amendment standing
purposes.

 Puerto Rico's criminal libel statute is not an antiquated
and moribund statute; it is less than thirty years old. Although
it has been amended four times since Garrison v. Louisiana, 379
U.S. 64 (1964), was decided, the amendments have not attempted to
conform the statute to the requirements of the First Amendment. 
The most recent amendment was in December 1999; it increased the
criminal penalties dramatically in order to deter "anti-social"
acts, including increasing the maximum fine tenfold. When the
Department of Justice was asked to comment on this change during
the pendency of this litigation, it supported the increased penalty
without raising any federal constitutional concerns. The only
constitutional protection the Department of Justice raised was "the
constitutional protection that exists against attacks against honor
and reputation." The defendants do not argue that the statute is
not in current use; they cannot, for it has been recently used.

 Nor does the libel statute carve out any exception for
journalists. The prosecution of Betancourt in 1999, thwarted only
by the judge in the probable cause hearing, belies the claim that
journalists are immune from prosecution. The Secretary of Justice
has not unequivocally stated a policy against prosecution of such
cases, and the Secretary's actions gainsay any such avowal. 
Indeed, when Officer Rivera threatened to institute a criminal
libel action against Mangual and notified the Department of
Justice, the Department did not advise against it.

 Even if the Department of Justice did disavow any
intention to prosecute either any criminal libel cases or any cases
against journalists, and it adhered to that policy, Mangual would
still have a credible fear of having criminal charges filed against
him by the local police, whom he has accused of corruption, and
other government officials similarly accused. Under Puerto Rico
law, if the crime is a misdemeanor, individuals may file a
complaint with the police or pro se; it is after probable cause is
shown and the matter is set for trial that the Justice Department
steps in to prosecute the case. The Secretary exercises no control
over whom the local police choose to prosecute for misdemeanors;
indeed, as the history of Betancourt's prosecution indicates, at
least one local police department prosecuted despite a federal
court injunction ordering it not to prosecute. The plaintiff's
credible fear of being haled into court on a criminal charge is
enough for the purposes of standing, even if it were not likely
that the reporter would be convicted.

 The defendants do not raise separate prudential standing
concerns, and we see none. "[A] realistic risk of future exposure
to [a] challenged policy . . . is sufficient to satisfy" prudential
as well as constitutional standing concerns. Berner v. Delahanty,
129 F.3d 20, 24 (1st Cir. 1997). Mangual's complaint makes a
sufficient showing of a credible threat of prosecution to secure
standing under Article III.

 2. Ripeness

 The district court also found that Mangual's claim was
not ripe. Like standing, the doctrine of ripeness has roots in
both the Article III case or controversy requirement and in
prudential considerations. See R.I. Ass'n of Realtors, 199 F.3d at
33 (citing Pub. Serv. Comm'n v. Wycoff Co., 344 U.S. 237, 242-44
(1952)). Determining ripeness requires the evaluation of "both
the fitness of the issues for judicial decision and the hardship to
the parties of withholding court consideration." Abbott Labs. v.
Gardner, 387 U.S. 136, 149 (1967).

 The inquiry into fitness is both a constitutional and a
prudential one. The constitutional inquiry, grounded in the
prohibition against advisory opinions, is one of timing. Reg'l
Rail Reorganization Act Cases, 419 U.S. 102, 140 (1974). "[I]ts
basic rationale is to prevent the courts, through avoidance of
premature adjudication, from entangling themselves in abstract
disagreements." Abbott Labs., 387 U.S. at 148. The prudential
concern is whether resolution of the dispute should be postponed in
the name of "judicial restraint from unnecessary decision of
constitutional issues," Reg'l Rail Reorganization, 419 U.S. at 138;
if elements of the case are uncertain, delay may see the
dissipation of the legal dispute without need for decision. By
contrast, the inquiry into hardship is wholly prudential. See
generally 1 L. Tribe, American Constitutional Law § 3-10 (3d ed.
2000).

 The district court found that Mangual's claim is unripe,
because he "is under no immediate or direct dilemma of facing a
prosecution," and because he "has not described a concrete plan to
engage in libel." Mangual, 203 F. Supp. 2d at 87. The district
court did not make clear under which prong of the ripeness
determination it was operating, or whether its concerns were
constitutional or prudential. It appears that the district court
was making a prudential determination based on fitness. The
reasoning seems to be that because Mangual might not in fact engage
in activities that run afoul of the statute, or because he might
never be prosecuted, the court should decline to consider the
merits of the constitutional challenge.

 The district court's analysis has two errors. First, its
analysis under the ripeness doctrine that Mangual does not face a
"credible threat of prosecution" is simply a repetition of its
standing decision, one that is mistaken. Mangual has averred an
intention to continue his work as an investigative journalist, and
the recent prosecutions under the criminal libel law indicate a
real threat of prosecution for his work. Ripeness does not require
that he wait for such a prosecution.

 Second, the district court failed to consider Mangual's
alternative ground for standing: the chilling effect that the
statute has on his work as a journalist. If that effect emanates
from a credible threat of prosecution, as it does here, Mangual
need not either describe a plan to break the law or wait for a
prosecution under it. The purpose of the alternative ground for
standing in such cases is so that plaintiffs need not break the law
in order to challenge it. "[T]he doctrine of ripeness . . . asks
whether an injury that has not yet happened is sufficiently likely
to happen to warrant judicial review." Gun Owners Action League,
Inc. v. Swift, 284 F.3d 198, 205 (1st Cir. 2002) (internal
quotation omitted). Here, that injury, the chilling effect, is not
only likely but has already come to pass. We find that Mangual's
claim is ripe for resolution.

 3. Mootness

 The doctrine of mootness enforces the mandate "that an
actual controversy must be extant at all stages of the review, not
merely at the time the complaint is filed." Steffel, 415 U.S. at
460 n.10. Thus, mootness can be viewed "as 'the doctrine of
standing set in a time frame.'" United States Parole Comm'n v.
Geraghty, 445 U.S. 388, 397 (1980) (quoting H.P. Monaghan,
Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363,
1384 (1973)). If events have transpired to render a court opinion
merely advisory, Article III considerations require dismissal of
the case. See County of Los Angeles v. Davis, 440 U.S. 625, 631
(1979). The burden of establishing mootness rests squarely on the
party raising it, and "[t]he burden is a heavy one." United
States v. W.T. Grant Co., 345 U.S. 629, 633 (1953). It must be
"absolutely clear that the allegedly wrongful behavior could not
reasonably be expected to recur." United States v. Concentrated
Phosphate Export Ass'n, 393 U.S. 199, 203 (1968). We exercise de
novo review when determining whether a case is moot. Verhoeven v.
Brunswick Sch. Comm., 207 F.3d 1, 5 (1st Cir. 1999).

 The district court found that Mangual's claim is moot,
because the one-year statute of limitations has expired as to an
action based on the newspaper articles about which Officer Rivera
threatened prosecution. Mangual, 203 F. Supp. 2d at 89; see 33
P.R. Laws Ann. § 3412(b). This mootness determination is
incorrect. A pending prosecution is not required for a party to
have standing, even if standing is asserted on the basis of a
party's intent to engage in potentially law-breaking activity. 
Mangual claims a threat of prosecution based on his ongoing
investigations. Mangual also claims standing based on the criminal
libel statute's chilling effect, which is an ongoing repercussion
of the statute. The expiration of the limitations period as
related to Rivera's particular threat does not moot either of these
standing grounds.

 Finally, this case meets the standards of the "capable of
repetition, yet evading review" doctrine. S. Pac. Terminal Co. v.
ICC, 219 U.S. 498, 515 (1911). That doctrine permits review of a
case even if a particular incident raising the issue has been
resolved, if "(1) the challenged action was in its duration too
short to be fully litigated prior to its cessation or expiration,
and (2) there was a reasonable expectation that the same
complaining party would be subjected to the same action again." 
Weinstein v. Bradford, 423 U.S. 147, 149 (1975) (per curiam). 
Mangual has asserted an intention to continue working and
identified individuals who might threaten him with prosecution in
the future. Thus, the doctrine applies here.

 Mangual's claims are not moot. The district court erred
in dismissing the case on that basis.

B. Intervenors

 The district court, in a summary discussion, found that
both Medina's and Caribbean's allegations of injury amount to mere
subjective fears and fail to meet the "objectively reasonable" test
required to create a case or controversy. Mangual, 203 F. Supp. 2d
at 90. We review denial of intervention for abuse of discretion. 
See Allen Calculators, Inc. v. Nat'l Cash Register Co., 322 U.S.
137, 142 (1944); Daggett v. Comm'n on Governmental Ethics &
Election Practices, 172 F.3d 104, 109, 113 (1st Cir. 1999). It is
an abuse of discretion for the district court to apply an erroneous
standard of law. It is clear that the district court applied
several erroneous standards in its legal analysis of Medina's
standing and that its conclusion as to the "objective
reasonableness" of Medina's fear of prosecution was in error, and
so there was an abuse of discretion.

 Whether standing is required for intervenors is an as yet
unsettled question. The controversy over whether intervention of
right under Fed. R. Civ. P. 24(a) requires Article III standing is
a well-known one. See Diamond, 476 U.S. at 68-69 & n.21; Daggett,
172 F.3d at 109. The requirement of standing for permissive
intervenors has received less attention but is no less unsettled. 
The traditional rule was that standing was required for permissive
intervenors but not for intervenors of right. In part because of
the 1990 amendments to the supplemental jurisdiction statute,
Judicial Improvements Act of 1990, Pub. L. No. 101-650, Title III,
§ 310, 104 Stat. 5089, 5113-14 (codified at 28 U.S.C. § 1367
(2000)), the standing requirements for intervenors are now greatly
confused. C.A. Wright & M.K. Kane, Law of Federal Courts § 75, at
548 (6th ed. 2002). It is clear that an intervenor, whether
permissive or as of right, must have Article III standing in order
to continue litigating if the original parties do not do so. 
Arizonans for Official English v. Arizona, 520 U.S. 43, 65 (1997);
Diamond, 476 U.S. at 68. However, the circuits are split on the
question of whether standing is required to intervene if the
original parties are still pursuing the case and thus maintaining
a case or controversy, as they are here. (6)

 We need not decide this complicated question, because it
is clear that Medina has sufficient standing under Article III. 
Medina is also a journalist working for El Vocero who has been
threatened with prosecution under the Puerto Rico criminal libel
statute. While the statute of limitations has expired as to that
particular threat, he continues to work as a journalist and to risk
prosecution under the statute. As such, he is in a position like
that of Mangual. Medina has expressed the fear that he may be
prosecuted and has articulated his desire to continue publishing,
as a journalist, on matters that may draw a libel prosecution. 
Given the history of threatened and actual prosecution under the
statute detailed above, Medina has evidenced enough of a threat to
establish standing to intervene in this suit.

 Under the circumstances of this case, we see no reason to
remand for consideration of Medina's motion to intervene under the
correct legal standards. We grant Medina's motion to intervene for
several reasons. First, the only objection raised as to
intervention was standing, and that has now been resolved in
Medina's favor. (7) Second, because we go on to resolve the merits,
there is no point in remanding this issue. Third, we have the
discretion to permit intervenors at the appellate level, and we
choose to do so here. See Ruthardt v. United States, 303 F.3d 375,
386 (1st Cir. 2002).

 Caribbean has also moved to intervene, based upon the
potential injury done to the newspaper it owns, El Vocero, through
the prosecution of its journalist employees. Because we hold that
both the plaintiff, Mangual, and the intervenor, Medina, have
standing to challenge the Puerto Rico criminal libel statute, we
need not reach the question of whether a newspaper can assert
standing to challenge a criminal libel statute based on threats of
prosecution against its reporters.

C. Abstention

 In the district court the defendants argued that the
plaintiff and intervenors could vindicate their rights by
undergoing criminal prosecution and presenting the Garrison issues
to the Puerto Rico courts. For this reason, they argued, the
federal court should abstain. Such an argument fundamentally
misunderstands the law of pre-enforcement action under the First
Amendment and of abstention. On appeal the Secretary urges that
the federal court stay its hand and wait "until the Puerto Rico
Supreme Court has had the opportunity to express itself." That
opportunity would presumably arise on appeal from a conviction of
a media defendant under the criminal libel statute.

 At no time has the Secretary of Justice identified any
unclear issue of state law, as opposed to federal constitutional
law, in this dispute. Nor has the Secretary ever requested
certification of any such issue to the Puerto Rico Supreme Court. 
We also note that this statute has been in place since 1974, and
the Puerto Rico courts have had ample opportunity to construe this
statute. When asked to apply the statute in light of federal
constitutional concerns in People v. Olivero Rodríguez, 112 P.R.
Offic. Trans. 460 (1982), the court did not address the federal
constitutional issues which concern us. Moreover, the question is
less one of construal of an unclear issue than of judicial
rewriting of the statute -- a statute that is not "readily
susceptible" to a narrowing construction. See Am. Booksellers
Ass'n, 484 U.S. at 397. (8)

 Defendants say their abstention argument falls under the
Pullman abstention doctrine. R.R. Comm'n v. Pullman Co., 312 U.S.
496 (1941). There the Supreme Court abstained from deciding a
constitutional issue which turned on an interpretation of state law
until the state courts were given the chance to clarify the state
law issue. Id. at 500. The Pullman doctrine requires that "when
a federal constitutional claim is premised on an unsettled question
of state law, the federal court should stay its hand in order to
provide the state courts an opportunity to settle the underlying
state law question and thus avoid the possibility of unnecessarily
deciding a constitutional question." Harris County Comm'rs Court
v. Moore, 420 U.S. 77, 83 (1975). Federal courts abstaining under
Pullman generally retain jurisdiction but stay the federal suit
pending a state court decision, unless the state courts cannot
proceed due to a prohibition on advisory opinions, in which case it
is dismissed without prejudice. See Tribe, supra, § 3-29 n.37. To
determine whether Pullman abstention is appropriate, "we consider
two factors: (1) whether there is substantial uncertainty over the
meaning of the state law at issue; and (2) whether a state court's
clarification of the law would obviate the need for a federal
constitutional ruling." Ford Motor Co. v. Meredith Motor Co., 257
F.3d 67, 71 (1st Cir. 2001). Neither condition is met here.

 If state law questions are unambiguous, abstention is
inappropriate. Examining Bd. v. Flores de Otero, 426 U.S. 572, 598
(1976). The statute is not ambiguous; the only issue is a federal
constitutional one. Since there is no ambiguous question under
Puerto Rico law, abstention is impermissible. See Wisconsin v.
Constantineau, 400 U.S. 433, 438 (1971); Rivera-Puig v. Garcia-Rosario, 983 F.2d 311, 322 (1st Cir. 1992).

 The need for a federal constitutional ruling would not be
obviated by abstention. That the defendants may prefer to have the
federal constitutional ruling made by a Puerto Rico court rather
than by a federal court is of no moment. The Puerto Rico courts
would be faced with exactly the same issues as this Court -- issues
which are federal ones and not ones of Puerto Rico law. The
plaintiff is entitled to his federal forum. Were we to abstain in
this matter, we would merely "await an attempt to vindicate the
same claim in a state court," McNeese v. Bd. of Educ., 373 U.S.
668, 672 (1963), and that we may not do. City of Houston v. Hill,
482 U.S. 451, 467-69 (1987).

 Not only does the case fall short of these two standards,
but the delay involved in abstention is especially problematic
where First Amendment rights are involved. Id. at 467 ("[W]e have
been particularly reluctant to abstain in cases involving facial
challenges based on the First Amendment."). Abstention in these
circumstances would be unwarranted. 

D. First Amendment Challenge

 1. Procedural Posture

 Normally, when a district court dismisses a matter on
jurisdictional grounds and this court reverses, the case is
remanded for consideration of the merits. See, e.g., Rivera-Gomez
v. De Castro, 843 F.2d 631, 634-35 (1st Cir. 1988). However,
"[w]here the merits comprise a purely legal issue, reviewable de
novo on appeal and susceptible of determination without additional
factfinding, a remand ordinarily will serve no useful purpose." 
N.H. Right to Life, 99 F.3d at 18; see, e.g., United States v.
Pierro, 32 F.3d 611, 622 (1st Cir. 1994); Cohen v. Brown Univ., 991
F.2d 888, 904 (1st Cir. 1993); Societe Des Produits Nestle, S.A. v.
Casa Helvetia, Inc., 982 F.2d 633, 642 (1st Cir. 1992). In N.H.
Right to Life, we confronted a similar circumstance: we reversed a
district court's dismissal, on standing grounds, of a First
Amendment challenge to a state statute. There, we reached the
merits of the plaintiff's constitutional challenge. 99 F.3d at 18. 
We do so here as well.

 The issues in contention are pure ones of federal law. 
At both the district court level and here, there have been
arguments on the merits from both sides, after limited discovery. 
Mangual filed a verified complaint, and there are relevant
affidavits in the record from Medina, Suárez and Betancourt. 
Mangual also filed a motion for summary judgment and addressed the
merits of his First Amendment claim, arguments he repeated in his
appellate brief. The Secretary also addressed the merits, both in
a memorandum opposing summary judgment before the district court
and in his appellate brief. Importantly, he did not oppose summary
judgment on the ground that there were material facts in dispute.

 This case asserting ongoing violations of constitutional
rights has also been prolonged for far too long. Mangual first
filed his complaint in September of 1999, when he also requested
summary judgment. Since that time he has requested adjudication of
this motion three times: in November 1999, in May 2000, and in June
2000. The case was transferred to a new judge in July 2000, and
between that time and March 2002, no action was taken on the
summary judgment motion. A resolution of this case is now due, if
not past due.

 2. Merits of First Amendment Claim

 The speech threatened here with prosecution under the
criminal libel statute is at the heart of the First Amendment
protections of speech and the press.

 The core facts are these: A newspaper publishes a series
of stories about corruption in government. In turn, the government
responds with actual and threatened criminal prosecution of the
reporters. The newspaper later publishes a story critical of a
candidate for high public office; the reporter is threatened with
criminal prosecution. The free press is threatened for commenting
on public officials on matters of public concern.

 "[T]here is practically universal agreement that a major
purpose of [the First] Amendment was to protect the free discussion
of governmental affairs." Mills v. Alabama, 384 U.S. 214, 218
(1966). "For speech concerning public affairs is more than self-expression; it is the essence of self-government." Garrison, 379
U.S. at 74-75. "The maintenance of the opportunity for free
political discussion to the end that government may be responsive
to the will of the people and that changes may be obtained by
lawful means, an opportunity essential to the security of the
Republic, is a fundamental principle of our constitutional system." 
Stromberg v. California, 283 U.S. 359, 369 (1931).

 The history of the United States has been marked by a
"profound national commitment to the principle that debate on
public issues should be uninhibited, robust, and wide-open, and
that it may well include vehement, caustic, and sometimes
unpleasantly sharp attacks on government and public officials." 
N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964). The
skepticism of government and the importance of the right to freely
criticize it are concepts with both deep roots in American history
and continuing importance. See 1 J. Trenchard & T. Gordon, Cato's
Letters: Essays on Liberty, Civil and Religious 96, 246-47 (1755)
("The exposing therefore of publick Wickedness, as it is a Duty
which every Man owes to Truth and his Country, can never be a Libel
in the Nature of Things."); C.R. Sunstein, Democracy and the
Problem of Free Speech 134 (1993) (arguing that distrust of the
government is strongest when "it is regulating speech that might
harm its own interests; and when the speech at issue is political,
its own interests are almost always at stake. It follows that the
premise of distrust of government is strongest when politics is at
issue").

 Against these fundamental principles we evaluate the
criminal libel statute challenged here, sections 4101-4104. We
find the statute unconstitutional under the First Amendment
standards established by the Supreme Court.

 a. Actual Malice

 The seminal New York Times case contains several
requirements that constrain libel law when the challenged statement
is about a public official. For public officials to recover
damages, they must prove "that the statement was made with 'actual 
malice' -- that is, with knowledge that it was false or with
reckless disregard of whether it was false or not." 376 U.S. at
279-80. Even when erroneous statements are published, the
statements may be protected, because "erroneous statement is
inevitable in free debate." Id. at 271. The "actual malice"
standard is distinct from common law malice, which refers to spite
or ill will. See Rosenbloom v. Metromedia, 403 U.S. 29, 52 n.18
(1971); Garrison, 379 U.S. at 78 (actual malice does not mean
"hatred, ill will or enmity or a wanton desire to injure").

 The court originally defined "public official" narrowly:
"The employee's position must be one which would invite public
scrutiny and discussion of the person holding it, entirely apart
from the scrutiny and discussion occasioned by the particular
charges in controversy." Rosenblatt v. Baer, 383 U.S. 75, 86
(1966). In practice, the term is now used more broadly and
includes many government employees, including police officers. L.
Tribe, American Constitutional Law § 12-12, at 866 (2d ed. 1988);
see, e.g., St. Amant v. Thompson, 390 U.S. 727, 730 & n.2 (1968)
(deputy sheriff); Price v. Viking Penguin, Inc., 881 F.2d 1426,
1431 (8th Cir. 1989) (FBI agent); Coughlin v. Westinghouse Broad.
& Cable, Inc, 780 F.2d 340, 342 (3d Cir. 1985) (police officer);
McKinley v. Baden, 777 F.2d 1017, 1021 (5th Cir. 1985) (same); Gray
v. Udevitz, 656 F.2d 588, 591 (10th Cir. 1981) (same); Meiners v.
Moriarty, 563 F.2d 343, 352 (7th Cir. 1977) (federal narcotics
agent). The Court later extended actual malice protection to
speech about public figures as well as public officials. See
Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 665-66 (1989) (describing the convoluted history of this doctrine). 
While the definition of "public figure" remains opaque, political
candidates unquestionably fall under that rubric. Id. at 660; see
Monitor Patriot Co. v. Roy, 401 U.S. 265, 271 (1971).

 In Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974), the
Court also applied constitutional constraints to civil suits for
defamation when the plaintiff is a private person but the statement
involves matters of public concern. Id. at 335, 347. For actual
damages to be awarded, such statements are not afforded the actual
malice protection given to statements concerning public officials
or figures, but some level of fault must be proven, be it
negligence or something more. Veilleux v. NBC, 206 F.3d 92, 108
(1st Cir. 2000). (9)

 The actual malice standard, and other constitutional
protections of criticisms of public officials, were extended to the
criminal libel context in Garrison. The court held that criminal
libel statutes share the constitutional limitations of civil libel
law. 379 U.S. at 67.

 Section 4101, on its face, is constitutionally deficient,
in that it does not require that the New York Times and Garrison
standard of actual malice be proven in order for a statement
disparaging a public official or figure to be successfully
prosecuted. The statute does not, by its terms, require proof that
the defendant either knew of the statement's falsehood or acted
with reckless disregard of falsehood. Therefore, section 4101 is
unconstitutional under Garrison, 379 U.S. at 74.

 The Secretary maintains that section 4101 has been
narrowed by the Supreme Court of Puerto Rico to incorporate the New
York Times actual malice standard. The Secretary points to
Olivero. There the court described the elements of the case: "a
real and malicious intent, indicating the untruth of the fact and
reckless disregard for the truth ('malice' animus injuriandi) which
is expressed directly in a publication . . . which communicates
information tending to denigrate a person's worth." 112 P.R.
Offic. Trans. at 465.

 Our reading of Olivero is quite different, and we think
it does not at all mean what the Secretary offers. That case did
not address the New York Times or Garrison requirement of actual
malice. It did cite federal caselaw, but only for the question of
who qualifies as a public figure, and it found that the case did
not involve a public figure. Further, the opinion's use of the
"reckless disregard" phrase is followed by the Latin phrase "animus
injuriandi," defined as "The intention to injure, esp. to insult." 
Black's Law Dictionary 87 (7th ed. 1999). That standard is
materially different from the one dictated by New York Times. See
Garrison, 379 U.S. at 78. The Olivero decision uses "reckless
disregard" to further define "a real and malicious intent," and it
does not impose a distinct requirement of knowing or reckless
disregard for the statement's truth.

 b. Truth as a Defense

 In addition to the actual malice standard, Garrison
requires that in a criminal libel prosecution for a statement
concerning a public official, truth must be a complete defense. 
Section 4102 does permit an unqualified affirmative defense of
truth, but it does so only if the victim "is a public officer and
the charge made refers to the performance of his duties." 
Otherwise, truth is only a defense if the defendant "had good
intention and justifiable ends." The section 4102 defense of truth
is not broad enough to encompass all constitutionally protected
statements. This affirmative defense is constitutionally
deficient.

 First, section 4102 only applies to statements about
public officials in the performance of official duties. Under
Garrison, the public officials exception does not extend only to
the discharge of official duties, but to "anything which might
touch on an official's fitness for office," including "dishonesty,
malfeasance, or improper motivation." 379 U.S. at 77. The
affirmative defense under section 4102 is not broad enough to cover
all such statements concerning public officials. And the default
provision -- that the defendant may otherwise prove truth as a
defense only by showing "good intentions and justifiable ends" --
does not cure the problem; it exacerbates it.

 The statutory affirmative defense also does not protect
all public figures, only public officers. Garrison rejected any
notion that the allegedly libelous utterance must have been
published "with good motives and for justifiable ends," as applied
to public officials. 379 U.S. at 70-73. Later rulings expanded
the New York Times standard to statements regarding public figures. 
See Gertz, 418 U.S. at 335. Thus, truth must be a complete defense
for all public figures, not merely public officials. Section 4102
does not provide such protection for statements involving public
figures who are not officials. For these reasons, section 4102 is
unconstitutional. (10)

 c. Report of Official Acts

 Section 4103 also applies to plaintiff's activities. 
Mangual investigated and reported the details of the judicial
proceedings against Betancourt. Mangual also reported on other
acts of official character, the internal investigations of the
police department. Section 4103 states that, as to judicial or
legislative acts, or any other act of "official character," any
report or statement which is true and fair "shall [not] be
considered to be libelous." The official Spanish version, enacted
in 1974, uses "imparcial y exacta," rendered in the official
English translation as "true and fair."

 Taking the statute as officially translated, we think the
"fairness" requirement is itself constitutionally deficient. A
true report of an official act is not protected; the report must be
"fair" as well. It is inconsistent with First Amendment standards
to require that a true statement about official acts must also be
fair. Further, when proving actual malice, falsity is not
established by "minor inaccuracies," whether deliberate or not. 
Masson v. New Yorker Magazine, 501 U.S. 496, 516-17 (1991). In
order to amount to a known or reckless falsehood, the alteration
must result "in a material change in the meaning conveyed by the
statement." Id. at 517; see Crane v. Ariz. Republic, 972 F.2d
1511, 1521 (9th Cir. 1992). Otherwise, small inaccuracies, if the
product of knowing or reckless behavior, could form the basis of
liability even when commenting about public officials or figures. 

 Mangual and the intervenors argue that the translation of
the passage as "true and fair" is neither true nor fair: they say
the original Spanish translates more accurately to "impartial and
exact." Their complaint appears to be a valid one. See Oxford
Spanish Dictionary 277, 335 (1996). Indeed, the only other Puerto
Rico statute that has a passage which is translated as "true and
fair" is 33 P.R. Laws Ann. § 517(5), and there the original Spanish
is "verdadero y justo." Were the statute read literally in
Spanish, an exactness standard (even an impartiality standard) is
even more clearly constitutionally deficient, for the reasons
stated above. 

 In the end, the constitutional infirmity does not depend
on whether the original Spanish or the official English translation
is relied upon. Section 4103 is not broad enough to privilege
minor inaccuracies when reporting on government acts, statements,
or debates.

 d. Further Arguments

 The plaintiff and intervenors challenge the criminal
libel statute on two additional grounds. First, they argue that
the penalty of restitution permitted by section 4101 violates the
Gertz requirement that damages be proven unless liability is
established under the actual malice standard. See Gertz, 418 U.S.
at 349-50 (prohibiting "presumed or punitive damages, at least when
liability is not based on a showing of knowledge of falsity or
reckless disregard for the truth" and requiring that "all awards
must be supported by competent evidence concerning the injury"). 
Second, plaintiffs independently challenge section 4104, which
requires that the criminal court "shall order" the publication of
conviction for libel through the same or analogous means as the
libel was published. The plaintiff and intervenors argue that this
provision unconstitutionally violates editorial independence under
the standards set out in Miami Herald v. Tornillo, 418 U.S. 241
(1974).

 We have held that section 4101 violates the First
Amendment under several analyses; as to section 4104, there is no
severability clause, and this section would in any event lack force
standing alone. We need not reach the separate questions of
whether the penalty of restitution or the requirement of
publication of conviction violates the First Amendment.

Conclusion

 We hold that the Puerto Rico criminal libel statute
incorporates constitutionally invalid standards in the context of
statements about public officials or public figures. We hold that
Puerto Rico's criminal libel statute, 33 P.R. Laws Ann. §§ 4101-4104, is unconstitutional under the First Amendment as applied to
statements regarding public officials or figures. We reverse the
denial of Medina's motion to intervene and grant intervention to
Medina, reverse the dismissal of the case on jurisdictional
grounds, and remand the case with instructions that the district
court enter a declaratory judgment and injunctive relief consistent
with this opinion. So ordered. Costs are awarded to Mangual and
Medina.
1. Of the Northern District of Illinois, sitting by
designation.
2. This translation does not include a December 10, 1999
amendment to section 4101; that amendment increased the criminal
penalty to incarceration between one and three years and a fine of
not more than five thousand dollars, but made no other changes to
the statute.
3. The residents of Puerto Rico are protected by the First
Amendment. Torres v. Puerto Rico, 442 U.S. 465, 469 (1979) (citing
Balzac v. Porto Rico, 258 U.S. 298, 314 (1922)). 
4. This letter and the response from the Department of Justice
were written in Spanish; we quote from the certified translation of
Rivera's letter, and a translation provided by the plaintiff of the
response.
5. Betancourt, Suárez, and the Overseas Press Club do not
appeal the denial of their motions to intervene.
6. Some cases have held that intervenors must independently
meet Article III standing requirements. See, e.g., EEOC v. Nat'l
Children's Ctr., Inc., 146 F.3d 1042, 1046 (D.C. Cir. 1998);
Mausolf v. Babbitt, 85 F.3d 1295, 1300 (8th Cir. 1996). Others
have held that intervenors need not show standing if the original
parties remain in the case. See, e.g., Ruiz v. Estelle, 161 F.3d
814, 830 (5th Cir. 1998); Chiles v. Thornburgh, 865 F.2d 1197, 1213
(11th Cir. 1989). See generally A.M. Gardner, Comment, An Attempt
To Intervene in the Confusion: Standing Requirements for Rule 24
Intervenors, 69 U. Chi. L. Rev. 681, 691-98 (2002) (collecting
cases).
7. Neither the district court below, nor the defendants on
appeal, argue that Medina or Caribbean's claims are unripe or moot;
they challenge jurisdiction over the intervenors' claims purely on
the basis of standing. In any event, the intervenors' claims are
neither moot nor unripe.
8. The vast majority of state courts that have found
constitutional infirmities in criminal libel statutes have declined
to rewrite them but have instead struck them down. See, e.g., Ivey
v. State, 921 So. 2d 937 (Ala. 2001); Gottschalk v. State, 575 P.2d
289 (Alaska 1978); Weston v. State, 528 S.W.2d 412 (Ark. 1975);
Eberle v. Mun. Court, 55 Cal. App. 3d 423 (1976); People v. Ryan,
806 P.2d 935 (Colo. 1991) (partial invalidation); State v.
Helfrich, 922 P.2d 1159 (Mont. 1996); State v. Powell, 839 P.2d 139
(N.M. Ct. App. 1992); Commonwealth v. Armao, 286 A.2d 626 (Pa.
1972); I.M.L. v. State, No. 20010159, 2002 Utah LEXIS 171 (Nov. 15,
2002).
9. The threats of prosecution to which the plaintiffs point all
involve statements regarding either public officials, such as
police officers, or public figures, such as political candidates. 
Thus, we have no occasion to consider whether the Puerto Rico
criminal libel statute is unconstitutional as applied to statements
about private figures on matters of public concern.
10. The criminal libel statute makes no mention of any
requirement that the prosecution prove a defendant's knowledge of
falsity or recklessness with regard to falsity. The plaintiff and
intervenors allege that this also makes the statute
unconstitutional.

 It is an open question whether criminal libel statutes must
include non-truth as an element of the crime instead of truth as an
affirmative defense. The Supreme Court, in Garrison, indicated
that the constitutional protections in the civil arena should apply
to criminal libel prosecutions as well. See 379 U.S. at 74 ("We
held in New York Times that a public official might be allowed the
civil remedy only if he establishes that the utterance was false .
. . . The reasons which led us so to hold . . . apply with no less
force merely because the remedy is criminal."). The Supreme Court
has also required that libelous statements in civil cases on
matters of public concern be proven false, at least against media
defendants. Phila. Newspapers v. Hepps, 475 U.S. 767, 778 (1986).

 One concern about placing the burden of proving truth on the
defendant is that it may require defendants to waive their Fifth
Amendment rights in order to take advantage of the New York Times
standards. In other words, the Puerto Rico statute potentially
puts defendants into the position of choosing between their First
and Fifth Amendment rights. Another concern is that journalists
may be unable to protect confidential sources if required to prove
the truth of published statements.

 It may be that the Supreme Court will reason that the
requirement that civil plaintiffs prove falsity in certain
circumstances means that prosecutors must also prove falsity as an
element of the crime of libel in those circumstances. However,
because the Supreme Court has yet to rule on this precise issue,
and because the Puerto Rico criminal libel statute clearly has
other constitutional infirmities, we need not reach this issue.